# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LIFEWATCH SERVICES, INC.

      Plaintiff,

v.

HIGHMARK INC., BLUE CROSS AND
BLUE SHIELD ASSOCIATION,
WELLPOINT, INC., HORIZON BLUE
CROSS BLUE SHIELD OF NEW JERSEY,
BLUE CROSS BLUE SHIELD OF SOUTH
CAROLINA, and BLUE CROSS BLUE
SHIELD OF MINNESOTA.

      Defendants.

No.  2:12-CV-05146

# LIFEWATCH'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... iii

I.    INTRODUCTION .................................................................................................1

II.   Statement of Alleged facts ..................................................................................1

    A.  LifeWatch Services' Provision of MCOT Services ........................................1

    B.  Defendants' Market Power ..............................................................................2

    C.  The Conspiracy to Deny Coverage for MCOT Services ..................................2

    D.  Harm to Competition from the Conspiracy .....................................................4

III.  LifeWatch Has Properly Alleged A Conspiracy .................................................6

    A.  LifeWatch's Complaint Satisfies the Pleading Requirements ..........................6

        1.  The Alleged Facts Involve Direct Evidence of Conspiracy...................6

        2.  LifeWatch Has Alleged Facts Showing Plausible Motive And Actions Against Interest.......................................................................8

        3.  Defendants' Proposed Evidence Is Irrelevant....................................11

    B.  The Conspiracy Allegations Are Valid Even Though Not 100% Effective .....15

IV.  LifeWatch Has Alleged Antitrust Injury And Harm to Competition ......................17

    A.  LifeWatch Has Properly Alleged Antitrust Injury............................................17

        1.  LifeWatch Has Alleged Anticompetitive Effects .......................................17

        2.  LifeWatch Has Alleged That The Harm To It Arises Out Of These Anticompetitive Effects ...............................................................20

    B.  LifeWatch Need Not Allege A Reduction In Competition "Among" Sellers .................21

    C.  LifeWatch Need Not, But Has, Properly Alleged Market Power......................23

        1.  LifeWatch Need Not Allege Market Power.................................................23

        2.  There Are Sufficient Additional Allegations Of Market Power Here .........24

V.  Defendants Are Not Exempt Under The McCarran-Ferguson Act ........................................26

    A.  Introduction.......................................................................................................................26

    B.  This Case Does Not Involve The "Business of Insurance" .................................................27

VI. LifeWatch has Properly Alleged Tortious Interference Under Pennsylvania Law ................32

    A.  Life Watch Has Properly Alleged Wrongful Conduct.......................................................32

    B.  LifeWatch Has Properly Alleged a Prospective Contractual Relation .............................33

    C.  There Is No "Purpose or Intent to Harm" Requirement Under Pennsylvania Law ..........36

VII.    CONCLUSION...................................................................................................................38

18816129.12

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.*,
  801 F. Supp. 1450 (E.D. Pa. 1992) ........................................................34

*Allen v. Dairy Farmers of Am., Inc.*,
  748 F. Supp. 2d 323 (D. Vt. 2010)..........................................................24

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3rd Cir. 1994) ...................................................................35

*American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) .................................................................35

*Anglin v. Blue Shield of Virginia*,
  693 F.2d 315 (4th Cir. 1982) .................................................................31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)...............................................................................18

*In re Auto. Parts Antitrust Litig.*,
  No. 2:12-CV-00201, 2014 WL 1746579 (E.D. Mich. Apr. 30, 2014) ....................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................6, 7, 8, 24

*Big Apple BMW, Inc. v. BMW of North America, Inc.*,
  974 F.2d 1358 (3d Cir. 1992)..................................................................32

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*,
  881 F. Supp. 860 (W.D.N.Y. 1994) ........................................................18

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3rd Cir. 2007) ...............................................................23, 27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)...........................................................................17, 22

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)......................................................................6

iii

*Coleman v. Cannon Oil Co.*,
  849 F. Supp. 1458 (M.D. Ala. 1993) ....................................................................16

*Cornell Companies, Inc. v. Borough of New Morgan*,
  512 F. Supp. 2d 238 (E.D. Pa. 2007) ...................................................................36

*Costlow v. United States*,
  552 F.2d 560 (3d Cir. 1977)...............................................................................13

*Frankford Hospital v. Blue Cross of Greater Philadelphia*,
  417 F. Supp. 1104 (E.D. Pa. 1976), *aff'd* 554 F.2d 1253 (3d Cir. 1977)...............32

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986)..........................................................................19, 20, 23

*FTC v. OSF Healthcare Sys.*,
  852 F. Supp. 2d 1069 (N.D. Ill. 2012) ..................................................................24

*FTC v. ProMedica Health Sys.*,
  No. 11-cv-47, 2011 WL 1219281 (N.D. Ohio, Mar. 29, 2011)...............................24

*Glenn v. Point Park College*,
  272 A.2 895, 899 (Pa. Super. Ct. 1971) ...............................................................37

*Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ..............................................................................16

*Group Life & Health Co v. Royal Drug*,
  440 U.S. 205 (1979)................................................................26, 27, 28, 31

*Hasbrouck v. Texaco, Inc.*,
  842 F.2d 1034 (9th Cir. 1987), *aff'd* ...................................................................20

*Hydrair, Inc. v. Nat'l Envtl. Balancing Bureau*,
  No. 2846, 2001 WL 1855055 (Apr. 23, 2001)...............................................36, 38

*IDT Corp. v. Building Owners and Managers Associations International*,
  No. Civ. A. 03-4113, 2005 WL 3447615 (D.N.J. 2005) ........................................25

*Ingram Corp. v. J. Ray McDermott & Co.*,
  698 F.2d 1295 (5th Cir. 1983) .............................................................................14

*In re Insurance Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010).......................................................................27, 28, 31

*Kelly-Springfield Tire Co. v. D'Ambro*,
  596 A.2d 867 (Pa. Super. Ct. 1991)......................................................................35

iv

*Lin v. Rohm and Haas Co.*,
    865 F. Supp. 2d 649 (E.D. Pa. 2012) ..........................................................33, 34

*Maris Distributing Co. v. Anheuser Busch, Inc.*,
    302 F.3d 1207 (3d Cir. 2002)..........................................................................25

*Mayer v. Belichick*,
    605 F.3d 223 (3rd Cir. 2010) ..........................................................................13

*McIlhenny v. American Title Insurance Co.*,
    418 F. Supp. 364 (E.D. Pa. 1976) ..................................................................31

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984)..........................................................................................21

*Northeast Women's Ctr., Inc. v. McMonagle*,
    670 F. Supp. 1300 (E.D. Pa. 1987) ................................................................21

*In re Northwest Airlines Corp. Antitrust Litig.*,
    208 F.R.D. 174 (E.D. Mich. 2002) ..................................................................8

*Operadora Maritima de Graneles, S.A. v. Gamesa Wind U.S., LLC*,
    989 F. Supp. 2d 445 (E.D. Pa. 2013) ....................................................1, 12, 13

*Owens v. Aetna Life & Casualty Co.*,
    654 F.2d 218 (3d Cir. 1981)............................................................................28

*Pennsylvania Dental Ass'n. v. Medical Serv. Ass'n of Pennsylvania*,
    815 F.2d 270 (3rd Cir. 1987) .....................................................................7, 15

*Pennsylvania v. NCAA*,
    948 F. Supp. 2d 416 (E.D. Pa. 2013) .............................................................21

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3rd Cir. 1993) ........................................................................13

*Phillips v. Selig*,
    959 A.2d 420 (Pa. Super. Ct. 2008)................................................................34

*Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*,
    801 F. Supp. 2d 1163 (D.N.M. 2011) ............................................................16

*In re Processed Egg Products Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) .............................................................32

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3rd Cir. 2010) ............................................................................23

v

*Rantnetwork, Inc. v. Underwood*,
No. 4:11-CV-1283, 2012 WL 1021326 (M.D. Pa. Mar. 26, 2012) .........................................37

*Robertson v. Sea Pines Real Estate Cos.*,
679 F.3d 278 (4th Cir. 2012) .........................................................................................7

*In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*,
184 F.3d 280 (3d Cir. 1999)..........................................................................................12

*Sabo v. Metropolitan Life Insurance Co.*,
137 F.3d 185 (3d Cir. 1998)..........................................................................................31

*Schachar v. Am. Acad. of Ophthamology, Inc.*,
870 F.2d 397 (7th Cir. 1989) ...................................................................................16, 17

*Texaco, Inc. v. Hasbrouck*,
496 U.S. 543 (1990)........................................................................................................20

*Thompson Coal Co. v. Pike Coal Co.*,
412 A.2d 446 (Pa. Super. Ct. 1979)............................................................................37, 38

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)......................................................................................25, 26

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
530 F.3d 204 (3d Cir. 2008)...........................................................................................16

*Transworld Technologies, Inc. v. Raytheon Co.*,
No. 06-5012, 2007 WL 3243941 (D.N.J. 2007) ................................................................21

*U.S. v. Brown Univ. in Providence in State of R.I.*,
5 F.3d 658 (3rd Cir. 1993) ..............................................................................................18

*Union Labor Life Ins. Co. v. Pireno*,
458 U.S. 119 (1982)..........................................................................27, 29, 30, 31

*United States Dep't of Treasury v. Fabe*,
508 U.S. 491 (1993).......................................................................................................31

*United States v. Beaver*,
515 F.3d 730 (7th Cir. 2008) ..........................................................................................16

*United States v. Blue Cross Blue Shield of Michigan*,
809 F. Supp. 2d 665 (E.D. Mich. 2011)...........................................................................24

*United States v. Foley*,
598 F.2d 1323 (4th Cir. 1979) ........................................................................................16

vi

*United States v. Gosselin World Wide Moving, N.V.*,
411 F.3d 502 (4th Cir. 2005) ......................................................................27

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)......................................................................................16

*UNR Industries, Inc. v. Continental Ins. Co.*,
607 F. Supp. 855 (N.D. Ill. 1984) ...............................................................31

*In re Urethane Antitrust Litig.*,
261 F.R.D. 570 (D. Kan. 2009)....................................................................14

*Virgin Atl. Airways, Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001)........................................................................19

*Vogel v. American Soc'y of Appraisers*,
744 F.2d 598 (7th Cir. 1984) ......................................................................22

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)...............................................................6, 8, 20

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
865 F. Supp. 2d 1002 (C.D. Cal. 2011) ......................................................30

*In re Wholesale Grocery Prod. Antitrust Litig.*,
752 F.3d 728 (8th Cir. 2014) ......................................................................14

## STATUTES

McCarran-Ferguson Act ...............................................................26, 27, 29, 31

Section 1 of the Sherman Antitrust Act ..............................................................16

## OTHER AUTHORITIES

Areeda and Hovenkamp XII Antitrust Law 3d.........................................................22

Restatement (2d) of Torts ...................................................................32, 37, 38

Restatement of Torts § 766 (1939) ...............................................................37

18816129.12

## I.    <u>INTRODUCTION</u>

Defendants' Motion to Dismiss LifeWatch's Complaint is based upon misstatements of the Complaint's allegations and of many well established principles of antitrust law. LifeWatch's complaint is detailed, factual and addresses every element of a well pleaded antitrust claim.  LifeWatch states a valid claim, and its case should go forward.

## II.    <u>STATEMENT OF ALLEGED FACTS</u>

### A.    <u>LifeWatch Services' Provision of MCOT Services</u>

The following briefly summarizes the facts alleged in LifeWatch's Complaint.[1]  Plaintiff LifeWatch Services, Inc. ("LifeWatch") is the provider of remote, ambulatory telemetry cardiac monitoring devices used for detecting arrhythmias as well as devices for home sleep testing for the diagnosis of obstructive sleep apnea.  Cplt. ¶ 7. Physicians use arrhythmia monitoring devices to remotely record a patient's electrocardiograph ("ECG") which measures a patient's heart rate and rhythm.  *Id.* at ¶¶ 43-44.

There are two main types of arrhythmia monitoring devices that patients wear for ECG testing.  Cplt. ¶ 44.  Holter monitors or ambulatory holter electrocardiography devices and ambulatory event monitors ("AEMs").  *Id.*  Holters are ineffective if a patient experiences infrequent symptoms.  *Id.*  In those cases, AEMs are used, which provide longer periods of monitoring.  *Id.*

MCOT devices are a more advanced type of AEM.  Cplt. ¶ 45.  An MCOT service is an automatically activated system that requires no patient intervention to either capture or transmit

---

[1] Of course, for purposes of this motion, the Court "must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Operadora Maritima de Graneles, S.A. v. Gamesa Wind U.S., LLC*, 989 F. Supp. 2d 445, 448 (E.D. Pa. 2013) (quoting *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008))

1

an arrhythmia when it occurs. *Id.* LifeWatch's LifeStar ACT system is a MCOT service. *Id.* at ¶ 46. Studies have shown that MCOT services provide more effective detection of infrequent cardiac arrhythmias than other AEM devices. *Id.* at ¶ 50. Physicians agree that MCOT services "are not considered investigational and experimental," but rather are "well studied and clinically appropriate in carefully selected situations." *Id.* at ¶ 51. MCOT services are also cheaper and more effective than telemetry in a hospital, as the mobile devices allow a patient to go about their daily business and exert themselves. *Id.* at ¶ 48.

Recognizing the life-saving benefits of MCOT services, Medicare, national insurers like Aetna, Humana and Coventry, and more than 300 other health care plans all provide coverage for LifeWatch's ACT service, as well as other suppliers' MCOT services. *Id.* at ¶ 4.

### B. Defendants' Market Power

Defendant Blue Cross and Blue Shield Association ("BCBSA") is a national federation of thirty-eight health insurance plans (the "Blue Cross Plans"). Cplt. ¶ 8.

The Blue Cross Plans "have substantial market power in the relevant market" for "MCOT services sold to or through commercial health plans" in the United States. Cplt. ¶¶ 69, 71, 75. Approximately "50% of all commercially-insured people in America belong to one of the Blue Cross Plans." *Id.* at ¶ 75. A Blue Cross Plan is the "largest commercial health insurer, measured by number of subscribers, in forty out of forty-seven states." *Id.* at ¶ 30. Blue Cross Plans also "have the broadest networks of hospitals and physicians across the United States." *Id.* at ¶ 32. In fact, Blue Cross' national network includes "90% of hospitals and 80% of doctors." *Id.*

### C. The Conspiracy to Deny Coverage for MCOT Services

The Defendants along with the other Blue Cross Plans have engaged in a conspiracy to adopt a set of medical policies that deny coverage for MCOT services provided by LifeWatch and other suppliers. Cplt. ¶¶ 2, 33-42, 57-63. Thirty-four of the thirty-eight Blue Cross plans do

not reimburse providers of MCOT services, pursuant to an agreement among the plans to substantially follow their joint, conspiratorial decisions on medical policies made through BCBSA. *Id.* at ¶ 4.

The Blue Cross Plans' individual medical policies are substantially determined by the BCBSA's national medical policies. *Id.* at ¶ 36. The BCBSA national policies are established collectively by the Blue Cross Plans, through the BCBSA Medical Policy Panel. *Id.* The BCBSA Medical Policy Panel holds meetings several times a year at which members of the Defendant Blue Cross Plans vote on medical policies. *Id.* Representatives of each Defendant Blue Cross Plan have attended these Medical Policy Panel meetings. *Id.*

The vast majority of the individual medical policies of each Blue Cross Plan must follow the medical policies established by BCBSA (the "Medical Policy Rule"). *Id.* The Medical Policy Rule was implemented "as a means to enforce virtual uniformity among the Blue Cross Plans so that they do not compete with each other on quality." *Id.* at ¶ 37. The Medical Policy Rule is reflected in a series of practices implementing the conspiracy, "including numerous meetings, audits, and postings and reaffirmations of medical policies as well as denials of claims . . . ." *Id.* at 41.

The Medical Policy Rule is enforced by BCBSA through a periodic audit of each Blue Cross Plan's medical policy. Cplt. ¶ 38. If a Blue Cross Plan's medical policies are not sufficiently in compliance with the BCBSA medical policies, then that Blue Cross Plan will either be warned or fined for lack of compliance. *Id.*

The BCBSA national medical policy regarding AEM states that MCOT services are either "not medically necessary" or "investigational" and therefore payment is denied. Cplt. ¶¶ 57, 58. Wellpoint, Horizon, BCBS of Minnesota, BCBS of South Carolina and the vast

3

majority of Blue Cross Plans have followed the BCBSA policy denying coverage for MCOT services and have adopted language similar to the BCBSA national medical policy.  *Id.* at ¶ 59.

Recognizing the life saving benefits of MCOT services, Highmark provides coverage for its own subscribers.  Cplt. ¶¶ 5, 65.  LifeWatch was previously able to make ACT claims through Highmark for patients throughout the United States as well.  *Id.* at ¶ 63.   However, in March of 2010, Highmark began enforcing the national conspiracy with respect to MCOT services, by refusing to pay LifeWatch and other providers of MCOT services with regard to services for members of the 34 plans that do not cover the treatment.  *Id.* at ¶¶ 5, 65, 83.

> ### D.   Harm to Competition from the Conspiracy

In the absence of the conspiracy, "individual Blue Cross Plans would have been subject to market forces of competition, creating incentives for them to comply with the desires of patients and their physicians."  Cplt. at ¶ 61.  Thus, in the absence of the conspiracy, Blue Cross plans would have unilaterally decided to cover MCOT services, as have Medicare and more than 300 commercial payors.  *Id.*  at ¶¶ 61, 84.

As LifeWatch explains in its Complaint, the "failure by an insurer to provide coverage for, and therefore to pay for, MCOT services, substantially reduces the orders of MCOT services by physicians and the decisions to utilize MCOT services by patients.  Because of the substantial costs of health care, including in particular the substantial cost to patients with significant health problems, such as cardiac problems, patients are unlikely to pay themselves for services which their insurer does not cover.  If a service is not covered by a patient's insurer, the patient's physician is not likely to recommend it or prescribe it, and the patient is not likely to choose it."  Cplt. ¶ 64.

In response to Highmark's refusal to pay for ACT claims of subscribers of other Blue Cross plans, LifeWatch began enrolling patients who would otherwise have received ACT

instead to its cardiac event monitoring ("CEM") product. Cplt. ¶ 67. While this product was the best available alternative for the patient, it lacks certain key functionalities found in the MCOT product. *Id.* For example, unlike the MCOT product, the CEM product does not provide real-time monitoring and does not provide physicians with as robust a clinical report of the patient's data. *Id.*

The Defendants' actions have therefore deprived their subscribers of the only real time ambulatory event monitors that provide continuous, around-the-clock monitoring services, and therefore, are potentially putting many lives at risk. *Id.* at ¶ 3.

A comparison of rates of use of ACT services per Blue Cross subscriber in 2009 reveals that the use rate outside of Highmark's territory (where the vast majority of subscribers were not covered by their Blue Cross plans) was 80% lower than within Highmark's territory (where coverage was available). Cplt. ¶ 83. This reflects a dramatic 40% market wide reduction in output due to the conspiracy. *Id.*

This reduction in output has caused LifeWatch to suffer lesser profits because it receives a lesser gross margin for CEM devices as compared to MCOT services. Cplt. ¶ 67. This reduction in profits hinders the ability of LifeWatch and other providers of MCOT services to engage in research and development that could lead to further improvements in the quality of MCOT services. *Id.* at ¶ 85.

Thus, the anticompetitive effects of the conspiracy include: (a) it "reduces the quality of cardiac monitoring, and deprives patients in the relevant market the benefit of quality competition"; (b) it "reduces the output of MCOT services in the relevant market"; and (c) it "substantially inhibits research and development, innovation and future competition to improve the quality of MCOT services." *Id.*

III.    **LIFEWATCH HAS PROPERLY ALLEGED A CONSPIRACY**

A.    **LifeWatch's Complaint Satisfies the Pleading Requirements**

Defendants' contention that LifeWatch's detailed Complaint fails to adequately allege a conspiracy is completely unsupportable.  First, the Complaint alleges substantial direct evidence of a conspiracy. That itself satisfies the antitrust pleading standards and does not require LifeWatch to meet elements particular to *Twombly,* which is relevant only to cases where the plaintiff does *not* allege direct evidence of an unlawful conspiracy.  Second, even without direct evidence, the Complaint meets the pleading requirements, *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), because it alleges that Defendants have acted contrary to their interests but for the existence of the conspiracy.  Third, the self-serving document upon which Defendants heavily rely in their motion to dismiss should not be considered on a motion to dismiss because the document was not specifically referenced in the Complaint.  Even if the Court were to convert Defendants' motion into a motion for summary judgment, it would be improper to grant such a motion without any discovery regarding whether the document reflected the actual policies and actions of the Defendants in practice and whether the document was in effect during the entirety of the period covered by the allegations in the Complaint.

1.    **The Alleged Facts Involve Direct Evidence of Conspiracy**

Defendants claim that LifeWatch's Complaint fails to meet the requirements of *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), because it does not properly allege motive, but the *Twombly/Iqbal* requirements require additional "contextual" allegations only when there are no allegations of direct evidence of a conspiracy.  *See e.g.*, *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) ("if a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled"); *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d

6

Cir. 2011) (*Twombly* factors examined "[i]n light of [plaintiffs] failure to allege direct evidence of an agreement . . .").

The allegations here include substantial direct evidence of a conspiracy.  LifeWatch alleges that the Blue Cross plans actually voted on which medical technologies would be approved by the group.  Cplt. ¶¶ 33, 36.  The Complaint also alleges that the National Blue Cross Association audited plans to determine whether they were sufficiently in compliance with the results of these votes, and assessed financial penalties when they were not.  *Id.* at ¶ 38.  Even the names of many of the individuals involved are identified.  *Id.* at. ¶ 36.  This is far more than mere "parallel" conduct, since by its nature it cannot be purely "unilateral."

Similar alleged facts were sufficient to sustain an antitrust complaint in *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012).  The Fourth Circuit concluded that on the alleged facts before it, the claim was not speculative, since it was based "on allegations that the MLS board members conspired in the form of the MLS rules, the very passage of which establishes that the defendants convened and came to an agreement."  *Id.*  (Emphasis added).

Just as the "passage" of rules in Robertson was direct evidence of a conspiracy, here the votes on medical technologies prove an agreement.  A vote is necessarily a collective decision.  And the Blue Cross plans could not have enforced their decisions through the threat of financial penalties without an agreement.

The same analysis was applied in *Pennsylvania Dental Ass'n. v. Medical Serv. Ass'n of Pennsylvania*, 815 F.2d 270, 272-274 (3rd Cir. 1987).  There, the defendant dental association's resolutions advocating a "uniform and unified position" among dentists and actions by the organization's dentist members were viewed by the Court as a "record abounding in direct, frequent, public, on-the-record evidence of improper concerted action."  The same is true here.

In fact, the direct evidence of conspiracy here is far more specific than that the Third Circuit deemed sufficient in *West Penn*.  In *West Penn*, the allegations were that the parties "formed an agreement to protect each other from competition;" that "UPMC agreed to use its power . . . to exclude Highmark's rivals and . . . in exchange Highmark agreed to take steps to strengthen UPMC and to weaken its primary rival, West Penn."  627 F.3d at 100.  If those allegations without more are sufficient to directly allege a conspiracy, the far more detailed allegations here, involving specific votes and enforcement mechanisms, are more than sufficient to do so.

Therefore, "motive" arguments are irrelevant here.  "Plaintiffs need not conjure up a motive to conspire, where the [defendants] themselves, or at least some of them, apparently perceived one."  *In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 202 (E.D. Mich. 2002).

### 2.      LifeWatch Has Alleged Facts Showing Plausible Motive And Actions Against Interest

Even if *Twombly* did apply here, Defendants' motive argument does not cast any doubt on the plausibility of LifeWatch's claim.  Defendants appear to argue that LifeWatch is alleging that policy holders would never switch away from a plan due to the failure to provide MCOT services, in which case (they argue) there is no incentive for separate Blue Cross plans to agree not to provide MCOT services.

But what LifeWatch alleges is that "[i]ndividual Blue Cross subscribers are very unlikely to switch from a **Blue Cross Plan to another (non-Blue Cross) insurer** because the plan does not cover **a particular** medical device or service . . ."  Cplt. ¶ 78.  (Emphasis added).  First, this language (which Defendants ignore) focuses on switching from a dominant Blue Cross plan to another insurer without such competitive strength, not to another Blue Cross plan.  Yet it is the

8

Blue Cross plans who are alleged to have conspired here.  Second, this analysis considered switching based on the unavailability of "*a particular* medical device or service," not differences in payment policies for a range of medical devices and services.  (Emphasis added).

Both prongs of the analysis are significant.  The Complaint makes clear that the competitive threat would be very different if a given Blue Cross plan faced competition from another Blue Cross plan with its greater reputation and strength paying differently for a range of medical devices and services.  The Complaint explains that by "eliminating differences between the Blue Cross Plans in the medical services for which they reimburse subscribers, [the conspiracy] reduces the ability of employers, especially national accounts, to make competitive choices between Blue Cross Plans."  *Id.* ¶ 34.

The analysis in the Complaint, in context, is consistent and plausible.  As long as the Blue Cross plans conspire, they can exercise market power, because large numbers of subscribers will not switch to a health plan with a lesser reputation and less competitive strength than a Blue Cross plan simply because the plan covers a particular service that the Blue Cross plan does not.  However, if the Blue Cross plans covered a very different range of services, medical services customers would have a much greater incentive to switch.  As a result, the incentive to compete would be much greater.  Cplt. ¶ 34.  The conspiracy to adopt relatively uniform plans with regard to covered medical services is designed precisely to prevent that.

Indeed, this explains why the requirement is that individual Blue Cross plans must follow the agreement for the "vast majority," but not all, medical services.  Cplt. ¶ 36.  Small variations among Blue Cross plans will not result in significant switching.  A failure to substantially adhere to the conspiracy, however, would have a very different result.

9

Defendants further allege in their brief that the Complaint concedes that the Blue plans do not compete with each other with regard to medical policies.  Defts. Br. at 10, FN2 (citing Cplt. ¶¶ 78-79).  Defendants here completely mischaracterize the Complaint.  The allegation in question relates to competition between Blue Cross plans and other non-Blue insurers, and for a single service, not for the alleged overall conspiracy on medical services.  Cplt. ¶ 77.  Elsewhere, the Complaint alleges that the Blue Cross plans would compete with each other with regard to the medical services they cover but for the conspiracy that has existed between them "since at least 1995 to limit competition with each other with regard to the medical services they cover." Cplt. ¶ 33.  See also Cplt. ¶ 2 ("[t]he Blue Cross plans have adopted a largely uniform set of medical policies which cut off coverage for life-saving technologies in order to reduce their competition with one another.").

Defendants also assert that "LifeWatch has alleged *no facts* showing that Blue plans' varying MCOT coverage decisions were contrary to the plans' individual self-interest or that the Blue plans had a rational motive to conspire."  Defendants' Motion to Dismiss ("Defts. Brief") at 16.  This is simply false.

The Complaint alleges that because MCOT is superior to alternative services, it would be in each Blue Cross' Plan self-interest, absent the conspiracy, to purchase "medical devices and services that provide the highest possible quality."  Cplt. ¶ 61.  They would need to do so to compete.  The highest quality services would include MCOT, which is cheaper and more effective than the alternatives.  Cplt. ¶¶ 48, 49, 50.  This is more than sufficient to state a claim.[2]

---

[2] Ironically, Defendants cite to the Complaint's quotations from the BCBSA National Medical Policy as supposed evidence that it would be in the individual self-interest of particular plans not to adopt MCOT services.  But the whole point of the Complaint is to explain that this reflects a conspiratorial decision, and a decision contrary to the medical evidence.  See Cplt. ¶¶ 47-56, 61-62.  Indeed, LifeWatch specifically alleges that the "conspiracy has effectively superseded

Given the dominance of the Blue Cross plans, Cplt. ¶¶ 30-32, 75-76, their conspiracy foreseeably will also cause non-Blue Cross plans to follow them in providing less than competitive coverage, just as such an "umbrella effect" can lead other firms to follow cartels' price increases. *See, e.g., In re Auto. Parts Antitrust Litig.*, No. 2:12-CV-00201, 2014 WL 1746579, at *9 (E.D. Mich. Apr. 30, 2014) (anticompetitive conspiracy creates an "umbrella" that allows non-conspirators to raise prices without fear of losing market share). Thus, even if no firm would unilaterally refuse coverage of MCOT services in a competitive world, it is plausible that some would do so in a world in which a conspiracy set the terms in the market.

Contrary to Defendants' contention, the Complaint does not acknowledge "that some Blue plans do not provide coverage for any MCOT products . . . because, in the plans' analyses, they are either 'not medically necessary' or 'investigational.'" Defts. Brief at 1 (citing Cplt. ¶ 35). That is what the conspiratorial documents state, Cplt. ¶¶ 57-59, but that is not the reality. As the Complaint clearly alleges, "individual medical policies are substantially determined by the BCBSA's national medical policies," *Id.* ¶ 36, and compliance with the national policy is enforced "among the Blue Cross Plans so that they do not compete with each other on quality." *Id.* at 37. The Defendants' determination that MCOT devices are "investigational," despite ample allegations to the contrary, is merely a pretext to avoid competing with each other on quality.

### 3. Defendants' Proposed Evidence Is Irrelevant

Defendants attempt to plug the gaps in their arguments by relying heavily on a self-serving document very likely created by the Blue Cross Blue Shield Association's lawyers.

---

individual decisions by Blue Cross Plans on price and quality with regard to MCOT services and other products." *Id.* ¶ 62.

Defendants also cite to two agency decisions upholding denials of MCOT coverage for one patient each in Michigan and California, based on their individual circumstances. Defts. Brf. at 17, FN 4. They have no relevance to the validity of LifeWatch's complaint.

11

Unsurprisingly, it includes recitals indicating that Blue Cross Blue Shield Association's medical policies are simply advisory and left to the discretion of particular Blue Cross plans.  Defts. Ex. 1 at 1.  Defendants argue that, without any discovery in this case, and without any reference to this document in LifeWatch's Complaint, somehow this document can be used to controvert the clear allegations in the Complaint and support a motion to dismiss.  Of course, this stands the basic rules of civil procedure on their head, for several reasons.

First, it is hornbook law that motions to dismiss assume the truth of the allegations in the Complaint.  When considering such a motion, this Court "must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Operadora Maritima de Graneles, S.A. v. Gamesa Wind U.S., LLC*, 989 F. Supp. 2d 445, 448 (E.D. Pa. 2013) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir.2008)).[3]

Second, while under certain limited circumstances, documents which are specifically referenced in the Complaint may be evaluated in deciding a motion to dismiss, LifeWatch's Complaint never references the document attached by Blue Cross.  LifeWatch's Complaint discusses a "Medical Policy Rule" but defines this rule in terms of a series of practices by the Blue Cross plans.  LifeWatch's Complaint never references the document attached by Blue Cross, and never even suggests that the Medical Policy Rule is embodied in a single document. The Complaint alleges that the "BCBSA national policies are established collectively by the Blue Cross Plans, through the BCBSA Medical Policy Panel."  Cplt. ¶ 36.  This Panel meets "ten

---

[3] *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 184 F.3d 280, 286 (3d Cir. 1999), cited by Defendants, in fact directly contradicts their position.  In that case, the court reversed and remanded a decision on a motion to dismiss based on an extrinsic document, because the court had converted the motion into a motion for summary judgment, and the Third Circuit found that the court did not provide the required notice thereof.  The court did not decide whether the documents could have been properly considered as part of a motion to dismiss.  184 F.3d at 289.

12

times a year," and Panel participants "vote as to whether a particular service, procedure, or medical device will be covered under the national policy and, if so, under what condition." *Id*. The Complaint alleges that the conspiracy "is enforced by BCBSA through a periodic audit of each Blue Cross Plan's medical policy," and that a noncompliant Blue Cross Plan "will either be warned or fined for lack of compliance." *Id*. at 38. Thus, as the Complaint explains, "this continuing conspiracy has been implemented by numerous overt acts within the last few years, including numerous meetings, audits, and postings and reaffirmations of medical policies as well as denials of claims . . . ." *Id*. at 41.

Therefore, Defendants' cases, all involving documents that were specifically referenced in the plaintiff's complaint, are irrelevant here.  *Mayer v. Belichick*, 605 F.3d 223, 230 (3rd Cir. 2010) and *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3rd Cir. 1993), merely held that a court may consider "undisputedly authentic documents if the complaint's claims are based upon these documents."  *Mayer*, 605 F.3d at 230 (quoting *Pension Ben. Guar. Corp.*, 998 F.2d at 1196).

Third, even if this were a motion for summary judgment, it would be completely improper to grant a motion based on the production by the Defendants of a single document without any discovery record as to whether that document: (1) actually reflected the practices of the Defendants, (2) actually was in effect during the entire time period covered by the Complaint, or (3) was actually utilized by the Defendants, or (4) was created to manufacture evidence to try to create a wall against antitrust challenge. See, e.g., *Costlow v. United States*, 552 F.2d 560, 563 (3d Cir. 1977) (reversing grant of summary judgment prior to discovery because it was improper to rely on a contract to determine whether defendant's driver was a de facto employee of the Postal Service without any "other evidence" regarding "whether the Postal

Service exercised such control over the mail truck and its driver, despite the contract").  And, of course, none of these issues could possibly be decided on a motion to dismiss.

The notion that conspiracy claims can be decided by a single "official" document likely heavily "massaged" by lawyers has been emphatically rejected in the antitrust cases.  As the Eighth Circuit recently stated in *In re Wholesale Grocery Prod. Antitrust Litig.*, 752 F.3d 728 (8th Cir. 2014), "[p]erhaps there are aspiring monopolists foolish enough to reduce their entire anticompetitive agreement to writing, which would make the answer easy. But most would-be monopolists probably can be expected to display a bit more guile, jotting down only a few seemingly common terms while sealing their true anticompetitive agreement with a knowing nod and wink." *Id.*

That is why the courts have recognized that the liberal policy favoring **discovery** is particularly appropriate in antitrust cases "to uncover evidence of invidious design, pattern, or intent." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009) (citing, *inter alia*,  *In re Aspartame Antitrust Litig.*, No. 2:06–CV–1732–LDD, 2008 WL 2275531, at *1 (E.D. Pa. May 13, 2008); *In re Microcrystalline Cellulose Antitrust Litig.*, 221 F.R.D. 428, 429–30 (E.D. Pa. 2004); *Callahan v. AE.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996)).  This is only logical, since, "it is likely that any business which knowingly violates the antitrust laws will do much to conceal its illegal acts for as long a period of time as is possible." *Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1314 (5th Cir. 1983).  The document cited by Defendants is likely just such an effort at concealment.  Defendants ought not to be able to "cherry pick" a single document without discovery of the entire documentary record.

Even if this Court did rely on Defendants' document, the document itself is problematic for them, to say the least.  First, it establishes that BCBSA promulgates a single, uniform policy

for the individual Blue Plans to follow.  Ex. 1 to Defts. Brief at 13.  While the document may indicate on its face that the Blue plans are not required to adopt the medical policies contained in the Medical Policy Reference Manual, *id.* at 1, this simply raises questions as to whether there was, in practice, an agreement or understanding.  The Complaint alleges that, in practice, Defendants enforce compliance with the national policy through audits of individual Blue Plans' policies and warnings or fines. Cplt. ¶ 38.

Moreover, the submitted document fails to address the time period covered by the conduct in the complaint.  The document states that it was updated on May 4, 2012. Yet, the Complaint alleges that the Blue Cross Plans have "agreed since at least 1995 to limit competition," Cpt. ¶ 33, and that the Medical Policy Panel began meeting ten times per year to vote on the BCBSA national policies for as long as "four years" before the Complaint was filed. *Id.* at ¶ 36.  A document that purports to have gone into effect only 4 months before the Complaint was filed cannot, on its face, contravene allegations of a conspiracy predating the document by years.

Even the self-serving statements in the document regarding its advisory nature prove nothing.  *See e.g. Medical Service Ass'n of Pennsylvania*, 815 F.2d at 272-273.  There the "abundance of direct evidence" included a series of "recommendations" and statements which "advocate" uniform positions, as well as resolutions "requesting" certain action and assertions that members "should" avoid certain action.  The Third Circuit thus held that uniform "recommendations" can lead to agreement, whatever phrasing is used.

### B.    <u>The Conspiracy Allegations Are Valid Even Though Not 100% Effective</u>

Defendants argue that there cannot be a conspiracy here, because certain Blue Cross plans admittedly pay for MCOT services.  However, the Complaint specifically alleges that the conspiracy requires compliance in "the vast majority" of medical policies.  Cplt. ¶ 36.  An

15

agreement that does not require 100% compliance is still an agreement, and it can still violate the antitrust laws if it has anticompetitive effects.

It is well-established that a conspiracy is not lawful simply because it is not 100% effective. The fact that some competition among the conspirators continues or is even allowed by the agreement "is of no consequence." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940). *See also e.g., Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 220 (3d Cir. 2008) (finding sufficient direct evidence of an agreement to go to a jury even though "some Mack truck dealers did not honor the 'gentleman's agreements' . . ."); *Coleman v. Cannon Oil Co.*, 849 F. Supp. 1458, 1465-1466 (M.D. Ala. 1993) ("if the evidence reflects that the defendants entered into a price fixing conspiracy, the fact that they did not observe the conspiracy on all occasions for all types of gasoline does not defeat the charge of price fixing."); *United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979) (the "partial non-performance of Bogley does not preclude a finding that it joined the conspiracy"); *United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008) ("occasional cheating" as irrelevant "because Section 1 of the Sherman Antitrust Act does not outlaw only perfect conspiracies…").

Defendants also claim that there cannot be an agreement here because any decisions by the Blue Cross Association are only "advisory." But the Complaint alleges just the opposite; that Blue Cross plans who do not comply with the conspiracy can be "fined for lack of compliance." Cplt. ¶ 38. See also cases discussed, *supra* at 6-8.

Similarly, Defendants cite cases that find that "non-binding" policies do not violate the antitrust laws. But these cases involved policies that did not require any compliance. *Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993), *Schachar v. Am. Acad. of Ophthamology, Inc.*, 870 F.2d 397 (7th Cir. 1989), and *Plant Oil Powered Diesel*

*Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163 (D.N.M. 2011).  For example, in *Schachar*, the advisory committee "did not expel or discipline or even scowl at members who performed [the procedure]."  Here, in contrast, compliance is required the "vast majority" of the time.  Cplt. ¶ 36.

Defendants also argue that LifeWatch's conspiracy claims are invalid because LifeWatch supposedly does not allege "parallel" conduct.  At any rate, LifeWatch has alleged predominantly parallel conduct on the part of the Blue Cross plans, stating that 34 of 38 plans have refused to cover MCOT services.  Cplt. ¶ 4.  Of course, since the alleged conspiracy doesn't require 100% compliance, Cplt. ¶¶ 36, 38, perfectly parallel conduct would not even make sense here.

## IV.   **LIFEWATCH HAS ALLEGED ANTITRUST INJURY AND HARM TO COMPETITION**

### A.     **LifeWatch Has Properly Alleged Antitrust Injury**

#### 1.      **LifeWatch Has Alleged Anticompetitive Effects**

LifeWatch's allegations of anticompetitive effects satisfy its burden to allege antitrust injury, as well as its burden to state a substantive claim under the Rule of Reason. Defendants challenge LifeWatch's antitrust standing, claiming that LifeWatch has failed to allege antitrust injury. This is not so. The Supreme Court precedent establishes that a plaintiff alleges antitrust injury when the injury "reflect[s] the anticompetitive effect [ ] of the violation . . . ." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). As discussed below, LifeWatch's Complaint alleges both that Defendants' conspiracy produced anticompetitive effects and that those effects injured LifeWatch. Additionally, LifeWatch's allegation of anticompetitive effects satisfies the Rule of Reason standard, because a plaintiff may satisfy its burden under the Rule of Reason "by proving the existence of actual anticompetitive effects, such as a reduction of

17

output,… increase in price, or deterioration in quality of goods or services." *U.S. v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 668 (3rd Cir. 1993).

Defendants' argument that LifeWatch has not alleged antitrust injury, but only injury to itself, utterly misstates what is contained in LifeWatch's Complaint.  The Complaint makes clear that the injury to LifeWatch arises from the injury to overall competition in the MCOT market: "The anticompetitive effects of this conspiracy include . . . [the fact that] it reduces the quality of cardiac monitoring, and *deprives patients in the relevant market the benefit of quality competition*."  Cplt. ¶ 85 (emphasis added).  The conspiracy "reduces the output of MCOT services in the relevant market" and it "substantially inhibits research and development, innovation and future competition to improve the quality of MCOT services."  *Id.*  The Complaint also alleges that as a result of the conspiracy, "the output of these [MCOT] services was substantially restricted."  Cplt. ¶ 82.

These allegations are supported by detailed factual averments, including a detailed discussion of the reasons why MCOT services are superior to the alternatives.  See Statement of Alleged Facts, *supra* at 1-2.  Cplt. at ¶¶ 45-56 and a specific quantitative analysis of how output has been reduced.  *Id.* at ¶ 83.

It is well-established that such effects on price, output, or quality constitute anticompetitive harm.  *See Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 877 (W.D.N.Y. 1994) ("fewer sales" constitute consumer harm and therefore harm to the public interest); *Brown Univ.*, 5 F.3d at 668 ("actual anticompetitive effects" include "reduction of output . . . increase in price, or deterioration in quality of goods or services . . ."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605-606 (1985) (evidence that product

preferred by consumers became less available was evidence that defendants conduct "has impaired competition in an unnecessarily restrictive way" and is therefore "exclusionary").

The courts have also recognized that reduced consumer choice harms competition. *See, e.g., FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (stating that "an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place,'… cannot be sustained under the Rule of Reason") (citations omitted). Certainly, the unavailability of MCOT services significantly harms consumer choice. The fact that consumers would freely choose MCOT services in the absence of a conspiracy is established by the relative use rates inside and outside Highmark's territory, discussed above.

The unavailability of high quality alternatives is also a recognized anticompetitive effect. *See e.g., Virgin Atl. Airways, Ltd. v. British Airways PLC*, 257 F.3d 256, 264-265 (2d Cir. 2001) ("whether an actual adverse effect [on competition] has occurred, is determined by examining factors like reduced output, increased prices and decreased quality . . ."). In *Virgin Atlantic*, the court found that "consumers experienced a decrease in quality due to Virgin's delayed entry" because "Virgin offered higher quality services than British Airways. Virgin met its burden . . ."

The conduct here is highly analogous to the conduct found by the Supreme Court to be unlawful in *Indiana Fed'n of Dentists*, 476 U.S. 447. There, the court assessed a "horizontal agreement among the participating dentists to withhold from their customers a particular service that they desire . . ." *Id.* at 459. The court held that a "refusal to compete with respect to the package of services offered to customers . . . impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers . . ." *Id.* The identical analysis applies to a decision by participating Blue Cross plans to withhold MCOT services. As in *Indiana Fed'n of Dentists*, "[a]pplication of the Rule of Reason to these facts is

19

not a matter of any great difficulty."  In the words of the Supreme Court, the Blue Cross plans are "not entitled to pre-empt the working of the market by deciding for [themselves] that [their] customers do not need that which they demand."  *Id.* at 462.

### 2. LifeWatch Has Alleged That The Harm To It Arises Out Of These Anticompetitive Effects

The harm to LifeWatch arises directly out of this harm to competition.  Fewer high quality MCOT services are purchased, and so LifeWatch's revenues and profits are reduced. Cplt. ¶¶ 82-86.  Thus, a refusal to purchase MCOT services harms competition and harms LifeWatch.  This is *precisely* what the law on antitrust injury requires:  "An antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful . . . The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *W. Penn Allegheny Health Sys.*, 627 F.3d at 101  (internal citations omitted).

While the antitrust laws are generally said to protect competition, not individual competitors, "[t]he oft-quoted chestnut distinguishing between protecting competition and protecting competitors has been misconstrued with some regularity by antitrust defendants . . . Injury to competition necessarily entails injury to at least some competitors."  *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987), *aff'd* sub nom. *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543 (1990). "Competition does not exist in a vacuum; it consists of rivalry among competitors. Clearly, injury to competitors may be probative of harm to competition . . ." *Id. See also W. Penn Allegheny Health Sys.*, 627 F.3d at 101 ("When the plaintiff's injury is linked to the injury inflicted upon the market . . . the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition.").

Defendants' cases involve completely different facts.  In *Northeast Women's Ctr., Inc. v. McMonagle*, 670 F. Supp. 1300, 1340-5 (E.D. Pa. 1987), the claim was dismissed where "plaintiff has rested its claim for antitrust recovery entirely on proof that the defendants seek to destroy its abortion business."  That is very far from what is alleged here.  Similarly, in *Pennsylvania v. NCAA*, 948 F. Supp. 2d 416, 431 (E.D. Pa. 2013), the court found implausible arguments that harm to the plaintiff alone would amount to harm in two relevant nationwide markets.  In *Transworld Technologies, Inc. v. Raytheon Co.*, No. 06-5012, 2007 WL 3243941 (D.N.J. 2007) at *6, the claim moreover was dismissed where "the complaint does not describe the marketplace, other than itself . . ."  That is very far from the case here.  See Cplt. ¶¶ 69-81.

### B.    LifeWatch Need Not Allege A Reduction In Competition "Among" Sellers

Defendants also argue that harm to competition in a rule of reason case such as this must be shown by evidence that competition "among" the sellers has been reduced in some way.  This is a proposition unknown in antitrust law.  One seller does not have to be hurt relative to others in order for overall competition to have been harmed.  See, e.g., *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98-101, (1984).  In *NCAA*, the Supreme Court held that the NCAA's plan for televising college football games, which plan limited the number of football games that any member school could televise, was an unreasonable restraint of trade even though the plan was not found to restrain competition "among" the sellers, i.e. the various member schools, because all were equally subject to the plan's restrictions.  *Id.*  In so holding, the Supreme Court found that the plan placed "an artificial limit on the quantity of televised football that is available to broadcasters and consumers" and thus—like Defendants' conspiracy in this case—was an illegal horizontal restraint. *Id.*

In an illustration of the "through the looking glass" quality of some of their arguments, Defendants argue on one hand that LifeWatch cannot have standing because it complains only

21

about harm to itself, and on the other hand there cannot be (allegedly necessary) harm "among competitors" here, because LifeWatch alleges harm to itself and all the other suppliers of MCOT services!   Defts. Brf. at 9-10, 20-21.   Of course, the fact that the Complaint alleges facts indicating that the entire market will be harmed is precisely what establishes harm to competition here and shows that this is not just a complaint by LifeWatch about its own interests.

In fact, Defendants' argument gets it exactly backwards.   It is a truism that the antitrust laws were enacted for the "protection of competition, not competitors," *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. at 487-8.   The kinds of effects on output and quality discussed above are those ultimate effects on competition.   Defendants' attempt to focus on "competition among sellers" attempts to exalt effects on individual competing sellers, which is precisely not the crux of antitrust concern.

This case, of course, alleges a "buyer conspiracy," an agreement among Blue Cross plans with regard to their practices in payment for (i.e. purchasing) MCOT products.   A buyer conspiracy, by its nature, harms sellers.   It will often harm them all in the same way.   For example, a buyer conspiracy to fix the price at which buyers purchase services is anticompetitive if it reduces the price of those services.   *See e.g. Vogel v. American Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("buyer cartels . . . force the prices that suppliers charge the members of the cartel below the competitive level…").   *See also e.g.* Areeda and Hovenkamp XII Antitrust Law 3d at 131-133 (The "economic consequences of buyer price fixing" are that the "price fixers pay less for the product they purchase . . . and [sellers] are forced to accept less than the competitive price for their product . . . individual [sellers] will either produce less or stop producing at all.")   Of course, if all sellers are forced to accept the same price, they will all be affected in the same way.   Competition "among" sellers will not change.

Similarly, here, a buyer conspiracy to refuse to buy the MCOT services necessarily harms all sellers of those services.  This hardly means that competition is not harmed.  If some sellers were unharmed, or were harmed less than others, would that mean that there is a more serious antitrust problem?  Of course not.  But that is the essence of Defendants' illogical, and legally unsupported, argument.

Defendants' cases are not to the contrary.  In *Race Tires America, Inc. v. Hoosier Racing Tire Corp*., 614 F.3d 57 (3rd Cir. 2010), the claim was that a particular supplier was chosen after a competitive "request for proposal" process.  *Id.* at 83.  Here, in contrast, LifeWatch alleges that the Blue Cross plans agreed not to purchase MCOT services at all, from any supplier, thereby eliminating any opportunity for any company offering MCOT services to compete for the sale of those services to Blue Cross plan subscribers.

### C.    LifeWatch Need Not, But Has, Properly Alleged Market Power

#### 1.    LifeWatch Need Not Allege Market Power

Defendants also argue that LifeWatch has not sufficiently alleged that they have market power.  This argument, as well, is both irrelevant and untrue.

It is irrelevant because controlling Supreme Court authority makes clear that market power need be alleged and proven only if there are no allegations of direct effects on competition, through price or output.  *Indiana Fed'n of Dentists*, 476 U.S. at 460-61.  *See also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3rd Cir. 2007).  Since there are detailed allegations here of direct effects on output and quality, Cplt. ¶¶ 3, 83-85, discussion, *supra* at Section IV.A, market power need not be alleged or proven.

### 2.    There Are Sufficient Additional Allegations Of Market Power Here

In any event, there are more than sufficient other allegations establishing the market power of the Blue Cross plans.  See Cplt. ¶¶ 30, 32, 75-76.  Statement of Alleged Facts, supra at 2.

This is more than sufficient under the established case law.  "Dismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory."  *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010).

*United States v. Blue Cross Blue Shield of Michigan,* 809 F. Supp. 2d 665 (E.D. Mich. 2011), is instructive regarding the relatively low threshold for pleading market power at the motion to dismiss stage.  *In Blue Cross Blue Shield,* the plaintiff government alleged "17 specific geographic markets" and claimed that "Blue Cross' market share . . . ranges from 40% to more than 80%."  The court found that this general statement, coupled with Blue Cross' admission that "it is the dominant health insurer in Michigan" and allegations of anticompetitive conduct which "have excluded competitors and caused prices increases" were viewed as sufficient to satisfy the "plausibility" requirement of *Twombly*.  Indeed, *Twombly* itself makes clear that a complaint "does not need detailed factual allegations."  550 U.S. at 555.

Defendants argue that the allegations in LifeWatch's Complaint regarding the shares of the insurance market of Blue Cross plans do not speak to their share, or market power, in the MCOT market.  This ignores the fact that health care services are purchased virtually universally by health insurance plans so that the sellers of health insurance are also the buyers of medical services.  *FTC v. ProMedica Health Sys.*, No. 11-cv-47, 2011 WL 1219281, at *5-6 (N.D. Ohio, Mar. 29, 2011). See also *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1083-84 (N.D. Ill.

2012).  Therefore, in this case, the shares in the selling market in fact do approximate the shares in the buying market.

Defendants mis-cite *Maris Distributing Co. v. Anheuser Busch, Inc.*, 302 F.3d 1207, 1214-15 (3d Cir. 2002) by quoting only a portion of the relevant sentence.  They quote the decision as stating "[A] defendant's market share in a market other than the alleged relevant market is irrelevant, and cannot be imputed…absent…a basis for such imputation."  But, the rest of the omitted sentence states that this is true "absent *a showing of some 'connection' between two different markets* that would provide a basis for such an imputation."  *Id.* at 1215.  LifeWatch has alleged just such a connection.

Similarly, in *IDT Corp. v. Building Owners and Managers Associations International*, No. Civ. A. 03-4113, 2005 WL 3447615 (D.N.J. 2005) at *9, (also cited by Defendants) market share in one market was not imputed to another market where there was no proof of any connection between power in the two markets.  Here, in contrast, such a connection is clearly alleged.

Defendants also argue that because most of the Defendants refuse to purchase MCOT services, they have a very low share of purchases of MCOT services.  But the reason the Defendants have a low share is because of their conspiratorial refusal to deal.  Their market power is represented by what they could buy.  As the Complaint makes clear, that is 60% of the market.  Cplt. ¶ 76.  That number reflects Defendants' power (which they have already exercised) to cause reductions in output and other anticompetitive effects.

This is consistent with the analysis in other cases where the competing sellers are also the applicable buyers of a relevant services.  The "equation for measuring market power in monopsony is a 'mirror image' of the relationships that create market power in a seller."  *Todd v.*

*Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001).   In *Todd*, the defendants' 80-90% share of petrochemical industry revenues were used to estimate their share of the services of the relevant industry employees.   *Id.   See also id.* at 195.

Under Defendants' theory, no successful boycott could ever be pursued under the antitrust laws, since the success of the boycott would mean that the product wouldn't be purchased, and therefore (under this view), the buyers would not have market power.   That makes no sense.   Market power is more than adequately alleged here.

## V.   DEFENDANTS ARE NOT EXEMPT UNDER THE MCCARRAN-FERGUSON ACT

### A.   Introduction

Defendants' argument that LifeWatch's claims are barred by the McCarran-Ferguson Act ignore or misstate controlling Third Circuit and Supreme Court precedent on what is, and most importantly, is not, the "business of insurance."

The controlling Supreme Court and Third Circuit cases establish several principles:

1.   The exemption is to be narrowly construed, consistent with Congress' intent to not interfere with collective insurer ratemaking, not at issue in this case.

2.   The "business of insurance" exemption applies to dealings between insurers and their insureds, not arrangements between insurers and providers of goods and services, such as LifeWatch.   As one head of the Antitrust Division of the U.S. Department of Justice put it, "The Supreme Court in *Group Life & Health Co v. Royal Drug*, 440 U.S. 205 (1979), clearly held that McCarran does not exempt insurers' dealings with health care providers from antitrust scrutiny."[4]

---

[4] Statement by Joel Klein before the House Judiciary Committee (June 22, 1999).

18816129.12

3.      Consistent with these principles, the exemption is limited to conduct reflected in the contract of insurance between the insurer and insured.  Actions entered into after that contract – such as Defendants' interpretation here of the contractual requirements that services be "medically necessary" and not "investigational" as excluding MCOT services, Cplt. ¶ 59, – do not qualify, because they are extrinsic to the contract between insurer and insured.

**B.**    **This Case Does Not Involve The "Business of Insurance"**

The analysis must begin with the well-established antitrust rule that any exemptions from the antitrust laws (including McCarran-Ferguson) are to be construed as narrowly as possible. *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982); *Royal Drug Co.*, 440 U.S. at 231. *Qualcomm Inc.*, 501 F.3d 297.  *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 351 (3d Cir. 2010) ("well settled" that exemptions from the antitrust laws are to be narrowly construed).  As the Fourth Circuit explained, "This narrow construction of antitrust immunity is appropriate because the robust marketplace competition that antitrust laws protect is a 'fundamental national economic policy'. . ."  *United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502, 508 (4th Cir. 2005) (citations omitted).

That narrow construction must begin with the recognition of the purpose of the statute. As the Supreme Court noted in *Royal Drug Co.*, 440 U.S. at 221, "the primary concern of both representatives of the insurance industry and the Congress [in enacting the McCarran-Ferguson Act] was that cooperative rate making efforts be exempt from the antitrust laws."  The Supreme Court referenced "the widespread view that it [was] very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation."  *Id.*  *See In re Insurance Brokerage Antitrust Litigation*, 618 F.3d at 354.

In *Owens v. Aetna Life & Casualty Co.*, 654 F.2d 218, 232 (3d Cir. 1981) and *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d at 355 (citing Owens with approval), four activities were identified as "the business of insurance," preparing and filing rate schedules; deciding upon rate classifications; authorizing agents to solicit individual or group policies; and accepting or rejecting coverages tendered by brokers.  654 F.2d at 225-6, cited at 618 F.3d at 355.  While these criteria were not described as exhaustive, it is clear that none of them are met by the allegations here.

In *Royal Drug*, the issue was whether agreements between health insurers and pharmacies were exempt under McCarran-Ferguson.  The Supreme Court found that they were not, "because of the Pharmacy Agreements involved parties wholly outside the insurance industry," *id.* at 231, i.e. providers of pharmacy services.  LifeWatch and other MCOT providers, like the pharmacies at issue in *Royal Drug*, are "wholly outside the insurance industry."  As the Supreme Court noted in *Royal* Drug, there is "not the slightest suggestion" that "Congress in any way contemplated" that conduct targeted at such providers is "the business of insurance."  *Id*. at 224.

The Supreme Court in *Royal Drug* made clear that McCarran-Ferguson does not apply to practices "which serve only to minimize the costs [the insurer] incurs in fulfilling its underwriting obligations."  440 U.S. at 213.  As a result, the practices at issue "do not involve any underwriting or spreading of risk . . ."  *Id.* at 214.  The same is true here.

Thus, as the Third Circuit noted in *In re Insurance Brokerage*, 618 F.3d at 357 "*Royal Drug* emphasized that Congress understood the 'business of insurance' as bound up with actuarial considerations intrinsic to the underwriting process . . ."  There are no allegations here

that decisions with regard to the Medical Policy Rule were made as part of any actuarial considerations,

A similar conclusion was reached by the Supreme Court three years later in *Pireno*, 458 U.S. 119, in an analysis that is precisely applicable here.  In *Pireno*, plaintiff challenged certain "peer review" practices of the defendant chiropractors, which were utilized "to aid insurers in evaluating claims for chiropractic treatments."  *Id.* at 123.  The chiropractors would "render an opinion on the necessity for the treatments and the reasonableness of the charges made for them."  *Id.*  This opinion was utilized by insurers since their "policies limit the company's liability to 'the reasonable charges' for 'necessary medical care and services.'"  *Id.* at 123. (Emphasis omitted.)

The Supreme Court found that these actions were "not a part of the 'business of insurance,'" *id.* at 129, because the process "plays no part in the 'spreading an underwriting of a policyholder's risk.'"  *Id.* at 130.  The Supreme Court noted, the "transfer of risk from insured to insurer is effected by means of the contract between the parties – the insurance policy – and that transfer is complete at the time that the contract is entered."  *Id.*  The Supreme Court referred to the "fundamental principle of insurance that the insurance policy defines the scope of risk assumed by the insurer from the insured . . . [the chiropractic] peer review committee is a separate arrangement between the insurer and third parties not engaged in the business of insurance."  *Id.* at 131.  That is because "the policy limits coverage to 'necessary' treatments and 'reasonable' charges for them [and therefore] that limitation is the measure of the risk that has already been transferred to the insurer . . ."  *Id.* at 130.

Because of this analysis, the Supreme Court found that the actions in question were not part of the "business of insurance" and the McCarran-Ferguson Act did not apply.

18816129.12

This analysis applies precisely to this case.  Here, LifeWatch's Complaint explains that Blue Cross insurance policies provide that treatments will be covered to the extent they are "medically necessary" and not "experimental."  Cplt. ¶ 35.  LifeWatch does not challenge this language in the policy, which, like the policy language discussed in *Pireno* requiring "necessary" treatments and "reasonable" charges, defines and sets forth the transfer of risk between insurer and insured.  The decision as to *which* services are provided fall within that definition, i.e. chiropractor services in *Pireno* and MCOT services in this case, is, under the *Pireno* analysis, "as a matter of indifference to the policyholder, whose only concern is whether his claim is paid, not why it is pa*id*."  *Pireno*, 457 U.S. at 132.  (Emphasis in original.)  But it is precisely that decision that is challenged as anticompetitive by LifeWatch's Complaint.  Under the *Pireno* analysis, the decision as to whether or not to pay for MCOT services is outside the insurance policy, and therefore outside the business of insurance and the McCarran-Ferguson exemption.  As the Supreme Court noted in *Pireno*, the "transfer of risk from insured to insurer . . . is complete at the time that the contract is entered."  458 U.S. at 130.[5]

Under the *Pireno* analysis, decisions as to whether services are "covered" are not the issue.  *See Pireno*, 458 U.S. at 132 ("when presented with policyholder claims for reimbursement, ULL [the insurer] must decide whether the claims are covered by its policies").  Nevertheless, the process applied in meeting that decision was *not* exempt under McCarran-Ferguson.  *See In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002,

---

[5] In *re Insurance Brokerage*, the allegations were that "Marsh's insurer–partners, agreed with each other not to compete for incumbent business."  *Id*. at 356.  They were found outside of the scope of McCarran-Ferguson.  That agreement is very similar to what is at issue in this case, an alleged agreement between Blue Cross plans not to compete for the business of customers desiring MCOT services.

1031 (C.D. Cal. 2011) (the Piereno court "held that the referral practice did not transfer risk but only reduced costs"). That conclusion applies here as well.

Contrary to Defendants' argument, the Supreme Court's decision in *United States Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993), also supports the conclusion that McCarran-Ferguson exemption does not exist here and that the existence of a "coverage" issue is not determinative. In that case, an exemption was found for a bankruptcy priority statute, which the court found was a statute "enacted . . . for the purpose of regulating the business of insurance." *Id.* at 504. The analysis therefore implicated a different clause of the McCarran-Ferguson Act (§ 2(b)) than the clause at issue here, involving only the "business of insurance" (§2(a)).[6] So the holding is irrelevant here. However in *dictum*, the Supreme Court in Fabe pointed out that the *Pireno* court found no exemption because the "practice at issue in that case had nothing to do with whether the insurance contract was performed; it dealt only with calculating what fell within the scope of the contract's coverage." *Id.* at 503. That language, again, precisely describes the circumstances here and that explains why "coverage" is not the issue.

Defendants' cases are not to the contrary. Thus, *Anglin v. Blue Shield of Virginia*, 693 F.2d 315, 320 (4th Cir. 1982) is not relevant here, because it specifically addressed "contracts between policy holders and Blue Cross," and because it predated *Perino*.[7] *McIlhenny v. American Title Insurance Co.*, 418 F. Supp. 364, 369 (E.D. Pa. 1976) is not relevant here, both because the decision predates both *Royal Drug* and *Perino*, and because it addresses a specific

---

[6] For this reason, the Third Circuit in *In re Insurance Brokerage*, *supra*, at 360-361 (3d Cir. 2010) explained that *Sabo v. Metropolitan Life Insurance Co.,* 137 F.3d 185 (3d Cir. 1998), cited by Defendants should not be utilized in analyzing the antitrust exemption under McCarran-Ferguson, because the case, which was under RICO was governed by a different, and broader, clause of the McCarran-Ferguson Act than is applicable here.

[7] Similarly, *UNR Industries, Inc. v. Continental Ins. Co.*, 607 F. Supp. 855, 862 (N.D. Ill. 1984), involved withdrawal of coverage for all asbestos injuries. An analogous provision here would eliminate any coverage for arrhythmia, certainly not alleged.

category of coverage in the contract, mechanics lien coverage.  That is not at issue here. *Frankford Hospital v. Blue Cross of Greater Philadelphia*, 417 F. Supp. 1104 (E.D. Pa. 1976), *aff'd* 554 F.2d 1253 (3d Cir. 1977) predates *Royal Drug*, and is directly overruled by it.

## VI.   LIFEWATCH HAS PROPERLY ALLEGED TORTIOUS INTERFERENCE UNDER PENNSYLVANIA LAW

### A.   Life Watch Has Properly Alleged Wrongful Conduct

Defendants' arguments attacking LifeWatch's tortious interference claims under Pennsylvania law are equally unavailing.  Defendants claim that LifeWatch has failed to allege improper conduct.  But improper conduct under Pennsylvania law includes "conduct that is in violation of antitrust provisions or is in restraint of trade."  *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1382 (3d Cir. 1992) (applying Pennsylvania law and the Restatement (2d) of Torts, applicable under Pennsylvania law).  Notably, *Big Apple BMW*, like this case, involved alleged refusals to deal by the defendants.

Defendants appear to argue that Highmark's actions could not be improper because by enforcing other plans' refusal to pay for MCOT services, it is acting in a way that is inconsistent with its own individual policy.  But this is not the point:  Highmark is enforcing a conspiratorial decision by the other plans.  See Cplt. ¶ 65 (Highmark's refusal to pay for claims for subscribers of other Blue Cross plans "was an affirmative act by Highmark to enforce the illegal horizontal conspiracy . . .")  If the conspiracy violates the antitrust laws, then an action by Highmark, which is alleged to participate in the relevant activities of the Blue Cross Association, *id.* at ¶¶ 65-68, is equally unlawful.  "Those who, with knowledge of the conspiracy, aid or assist in carrying out the purposes of the conspiracy make themselves parties thereto and are equally liable to or guilty with the original conspirators."  *In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d 709, 742, n.33 (E.D. Pa. 2011).

18816129.12

### B.        LifeWatch Has Properly Alleged a Prospective Contractual Relation

Nor are Defendants correct in their argument that LifeWatch has failed to adequately plead a prospective contractual relation.  The test under Pennsylvania law is whether facts are alleged that support a "reasonable likelihood or probability" that a contract would have been obtained "absent the defendant's interference."  *Lin v. Rohm and Haas Co.*, 865 F. Supp. 2d 649, 671 (E.D. Pa. 2012).

That standard is certainly met here.  LifeWatch alleges that the rate of use of its services per Blue Cross subscriber is 80% lower outside of Highmark's territory (where most of the services are not covered pursuant to the conspiracy) than in that territory.  Cplt. ¶ 83.  That presents substantial evidence that there are large numbers of patients who would use MCOT services if they were covered by their Blue Cross plan, but today do not.

LifeWatch also alleges that on the merits of its product, it has obtained contracts with a vast number of health care plans, starting with Medicare, with the notable exception of the conspiring Blue Cross plans.  Cplt. ¶¶ 4, 61  Indeed, that was the independent decision made by Defendant Highmark, before it decided to accede to the conspiracy.  *Id.* ¶ 63.  Finally, the complaint alleges that a wide variety of studies have established the benefits of MCOT services, which are superior to the alternatives.  *Id.* ¶¶ 49-50.  This is all strong evidence that other Blue Cross plans would cover MCOT services absent the conspiracy.  See also. Cplt. ¶ 66.

Thus, contrary to Defendants' mischaracterization, LifeWatch's Complaint does not base its allegations that there is a prospective advantage here merely on "existing demand."  Def. Brf. at 28.  LifeWatch relies upon specific evidence of the desire of physicians and patients to utilize MCOT services more broadly than they are currently permitted to do so.

18816129.12

Thus, *Phillips v. Selig,* 959 A.2d 420, 429 (Pa. Super. Ct. 2008), states only, as Defendants note, that an expectancy may not be "based *only* on an existing relationship." (Emphasis added).  But that is not the case here.

This fact pattern is very similar to that presented in *Lin, supra.*  Plaintiff alleged that she received eight Department of Energy Small Business Innovation Research grants prior to April of 2008, and that her failure to receive an additional grant was due to tortious interference by the defendant.  *Id.* at 671.  This historical pattern she claimed, established the "reasonable probability" that she would have received the additional contract but-for the interference.  *Id.*

The motion to dismiss Lin's claims was rejected.  The court held that "determining whether Dr. Lin has established such a reasonable probability requires a factual analysis that is not appropriate at the motion to dismiss stage, when the factual record has not yet been developed."  The court therefore "conclude[d] that her allegations are sufficient to state a claim . . ."  865 F. Supp. 2d at 671.

LifeWatch's inference is also very similar to the inference found unlawful by the court in *Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.*, 801 F. Supp. 1450, 1459 (E.D. Pa. 1992), cited by Defendants.  In *Advanced Power Systems*, a sufficient claim of lost prospective business was found as a result of allegations of bid rigging where the counter-plaintiff stated that it was "one of a limited number of approved subcontractors eligible to bid . . . Therefore the averment of a rigged bidding process sufficiently establishes a 'reasonable likelihood or probability that an anticipated business arrangement would have been consummated' . . ."

The same conclusion is certainly appropriate here.  LifeWatch's successes at obtaining substantial MCOT business where there is no conspiracy provides more than enough basis,

certainly at the pleading stage, to conclude that there was a "reasonable likelihood" that it would also have obtained these Blue Cross contracts but-for the conspiracy.

Defendants' cases are not to the contrary.  Defendants rely on *American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 228 (4th Cir. 2004), a case that applies Virginia law, where the standard (very much unlike Pennsylvania) requires a "reasonable certainty," not merely a "reasonable probability."

Defendants miscite *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3rd Cir. 1994), when they state that "LifeWatch must identify 'with sufficient precision contracts and prospective contracts which were interfered with.'"  Defts. Brf. at 29.  (Emphasis added).  There is a good reason why the word "must" are not in quotations in Defendants' brief.  Neither that word nor that concept ever appeared in *Alvord-Polk*.  The court said simply that "plaintiffs have failed to identify" such relationships.  37 F.3d at 1015.  The court went on to make clear that something less than that would have been sufficient, when it stated that "[n]or have they [plaintiffs] demonstrated a reasonable probability that they would have entered into prospective contracts with third-parties but for defendants' alleged interference."  The Third Circuit went on to add that "plaintiffs have failed to advance more than speculation to support their claim . . ." *Id.*  Here, of course, there are substantial alleged facts that do demonstrate that probability.  There is far more than speculation here.

Certainly, there is no requirement that specific prospective contracts be identified in order to state a claim for tortious interference.  Pennsylvania courts have held that this is not necessary because "prospective contractual relations are, by definition, not as susceptible of definite, exacting identification as is the case with an existing contract with a specific person."  *See Kelly-Springfield Tire Co. v. D'Ambro*, 596 A.2d 867, 871 (Pa. Super. Ct. 1991).

35

In *Hydrair, Inc. v. Nat'l Envtl. Balancing Bureau*, No. 2846, 2001 WL 1855055 at *6 (Apr. 23, 2001), an allegation that the plaintiff was "completely barred . . . from doing business in [defendant's] territory" was a "sufficient allegation that prospective contractual relations existed."  This is quite similar to the allegations in this case, involving a refusal by the vast majority of Blue Cross plans to deal with MCOT providers.

### C.    There Is No "Purpose or Intent to Harm" Requirement Under Pennsylvania Law

Defendants are incorrect in claiming that there must be an actual "purpose or intent to harm" for tortious interference to exist in Pennsylvania.  While some cases use that language, that is not the prevailing law.  Most significantly, *Walnut Tree Assoc. Co. Inc. v. Brokerage Concepts*, Ins., 20 A.3d 468, 476 (Pa. Super. Ct. 2011), a very recent Pennsylvania Supreme Court decision, notes that the determination of "whether an actor's conduct is intentionally interfering" depends on a variety of factors including "the nature of the actor's conduct," "the actor's motive," the "interest of the parties in society" and "the relations between the parties."  The court does not refer to a "purpose to harm."   *See also* 20 A.3d at 476, n.9 (tortious interference does not involve "malice in the sense of ill will but merely purposeful interference without justification").  See also *Cornell Companies, Inc. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 270-71 (E.D. Pa. 2007) (stating that the elements of a tortious interference claim under Pennslyania law include "purposeful action on the part of the defendant, specifically intended to harm the existing relation, **or** to prevent a prospective relation from occurring [and] the absence of privilege or justification on the part of the defendant") (emphasis added).  This is just another way of stating that all that is required under Pennsylvania law regarding intent is purposeful interference without justification.

The Pennsylvania cases (including *Brokerage Concepts*) rely on the Restatement (2d) of Torts for their articulation of tortious interference doctrine.  The Restatement (2d) makes clear that if there is a purpose to harm, that can create liability even absent wrongful behavior.  See Section 766B.  But such a purpose to harm is not a required element of the tort.  *See* Restatement 2d § 766 comments r, s.  ("Ill will on the part of the actor towards the person harmed is not an essential condition of liability under the rule stated in this Section");  (References to "malice" in the judicial opinions "make clear that what is meant is not malice in the sense of ill will but merely 'intentional interference without justification.'").[8]

Defendants miscite *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 446 (Pa. Super. Ct. 1979), which is directly contrary to their position.  The case does not reference an "intent to harm" element in connection with claims of tortious interference.  The discussion of that element in *Thompson* Coal concerns an entirely different tort, civil conspiracy.  When discussing tortious interference, the Pennsylvania Supreme Court cites with approval the Restatement of Torts § 766 (1939) which (as the Supreme Court's quotation makes clear) does not include an "intent to

---

[8] While these comments are in the section relating to tortious interference with contract, comment f to Section 766B, "intentional interference with prospective contractual relation," also refers to these comments as applicable to the elements of "malice and ill will."  See comment f to Section 766B.

While *Glenn v. Point Park College*, 272 A.2 895, 899 (Pa. Super. Ct. 1971), emphasized by Defendants, does refer to "the purpose of causing harm to the plaintiff," it also relies heavily on the "Tentative" Restatement 2d, since the current Restatement had not been adopted.  It interprets the Tentative Restatement as requiring "an intent to cause harm," and holds that the plaintiff's complaint therefore "does not meet the test of the Restatement."  272 A.2d at 899.  Since that statement is no longer accurate, *Glenn* does not today provide an accurate statement of the law in Pennsylvania.

*Rantnetwork, Inc. v. Underwood*, No. 4:11-CV-1283, 2012 WL 1021326 (M.D. Pa. Mar. 26, 2012), cites to the purpose issue as pure dictum, as part of a brief recitation of the elements of tortious interference that is never addressed further in the opinion.

harm" element.  It simply requires a wrongful inducement "without a privilege to do so."  *See* 488 Pa. at 207.  Thus, *Thompson* substantially undercuts Defendants' claim.

Moreover, intent to harm can certainly be inferred here.  As the court explained in *Hydrair*, *supra*, 2001 WL 1855055 at *6, "intent extends both to the desired consequences and to the consequences substantially certain to follow from the act."  Of course, Highmark necessarily knew when it quit paying LifeWatch, that LifeWatch would not have a relationship with insureds in the states of those Blue Cross plans.  See Cplt. ¶ 65.  *Hydrair* also cites the Restatement 2d of Torts, which provides that "intent" means "that the actor desires to cause [the] consequences of his act or that he believes that the consequences are substantially certain to result from it."  The case law is consistent with LifeWatch's allegations.

## VII.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

s/David A. Ettinger
David A. Ettinger ( P26537)
Lara Fetsco Phillip (P67353)

660 Woodward Avenue
2290 First National Building
Detroit, MI  48226
(313) 465-7368
dettinger@honigman.com
lara.phillip@honigman.com

Michael J. McCarrie
PA I.D. #57671
1500 Market Street, Suite 4100
Philadelphia, PA 19102
(267) 886-1852 (office); (215) 735-1714 (fax)
mjm@artzhealthlaw.com

Counsel for LifeWatch Services, Inc.

18816129.12

I hereby certify that on September 24, 2015, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


Dated: September 24, 2015                    /s/David A. Ettinger

                                             David A. Ettinger ( P26537)
                                             660 Woodward Avenue
                                             2290 First National Building
                                             Detroit, MI  48226
                                             (313) 465-7368
                                             dettinger@honigman.com

39