IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LIFEWATCH SERVICES, INC.,          :     CIVIL ACTION
                                   :     NO. 12-5146
          Plaintiff,               :
                                   :
     v.                            :
                                   :
HIGHMARK, INC., et al.,            :
                                   :
          Defendants.              :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                         April 3, 2017


          This is an antitrust action alleging a nationwide

conspiracy amongst Blue Cross and Blue Shield Association and

the administrators of several separately owned, locally operated

Blue Cross and Blue Shield Plans to deny insurance coverage for

certain mobile cardiac outpatient telemetry devices produced by

Plaintiff LifeWatch Services, Inc. The defendants have moved

collectively to dismiss the currently operative complaint in

this case. For the reasons that follow, the Court will grant the

motion.


I.   **FACTUAL BACKGROUND**

     A.   Mobile Cardiac Outpatient Telemetry

          A mobile cardiac outpatient telemetry ("MCOT") device

is one of several types of arrhythmia monitoring devices that a

physician may prescribe to remotely record a patient's

electrocardiograph ("EKG"), which displays a patient's heartbeat patterns to enable physician diagnosis. See Third Amended Compl. ¶¶ 29, 33, ECF No. 90 (hereinafter "TAC"). In general, four different types of arrhythmia monitoring devices may be used for EKG testing: (1) Ambulatory holter electrocardiography devices (also known as Holter monitors), (2) ambulatory event monitors, (3) insertable monitors, and (4) telemetry monitors (also known as MCOT devices). See id.

According to Plaintiff LifeWatch Services, Inc. ("LifeWatch"), MCOT devices offer several advantages over other types of arrhythmia monitoring devices, including an ability to "record both normal and abnormal heart activity . . . and . . . transmit all of the data promptly," "store all of the cardiac data during the time when the patient wears the monitor, resulting in more data collection," and "detect certain arrhythmias based on user-definable input formulae." Id. ¶ 33(a)-(c). Additionally, MCOT devices "do[] not require a patient's intervention to either capture or transmit data on an arrhythmia," and thus "the time from recording to transmission and subsequent physician notification and intervention is significantly reduced" as compared to other devices. Id. ¶ 33(d)-(e). These features arguably make telemetry superior to all other types of monitoring, particularly for low-risk patients experiencing infrequent arrhythmias. Id. ¶ 34(c).

B.    <u>The Parties</u>

LifeWatch, a Delaware corporation headquartered in Rosemont, Illinois, is "one of the two largest sellers of telemetry monitors." <u>Id.</u> ¶ 11. Their specific product at issue in this case, originally marketed as the "Lifestar Ambulatory Cardiac Telemetry" and later renamed the "LifeWatch MCT 3-Lead," is referred to by the parties as "ACT." <u>Id.</u> LifeWatch has two patient-monitoring facilities for privately insured patients, one in Philadelphia and the other near Chicago, from which "LifeWatch personnel analyze data transmitted from LifeWatch's devices, which are mostly ACT devices." <u>Id.</u>

Blue Cross and Blue Shield Association (the "Association") is a national federation of thirty-six health insurance plans (the "Blue Plans") that, though each separately owned, are all licensed by the Association to use the Blue Cross name. <u>Id.</u> ¶ 1. The Association is the largest commercial health insurer in the United States. <u>Id.</u> ¶ 3. It provides insurance coverage to approximately 105 million Americans, or roughly fifty percent of all commercially insured individuals in the United States. <u>Id.</u> ¶ 12. In addition to the Association, Defendants in this case include the following parties, all of which are administrators of various Blue Plans: Blue Cross; WellPoint, Inc.; Horizon Blue Cross Blue Shield of New Jersey;

3

Blue Cross Blue Shield of South Carolina; and Blue Cross Blue
Shield of Minnesota (collectively with the Association,
"Defendants").[1] Id. ¶¶ 13-16.

    C.    Allegations

        The thrust of LifeWatch's complaint is that, despite
ample scientific evidence supporting the efficacy of telemetry,
Defendants have continuously conspired for years to deny
insurance coverage for MCOT devices and services. See id. ¶¶ 5-
8, 46. LifeWatch alleges that "[t]here is a reason why, for more
than a decade, almost all Blue Plans have uniformly held, year
after year, that for all patients and all conditions, telemetry
is never 'medically necessary,'" despite evidence to the
contrary. Id. ¶ 56. This reason, according to LifeWatch, is "a
horizontal anticompetitive agreement" they refer to as "the Blue
Cross 'Uniformity Rule.'" Id.

        LifeWatch claims that the "Uniformity Rule" is an
illegal agreement amongst Blue Plans to substantially conform to
the terms of a model medical policy providing "directions . . .
on what claims to deny and what to accept." Id. ¶ 57. These
terms are allegedly set by a "Medical Policy Panel" that meets

_____

[1]    Former Defendant Highmark, Inc. was dismissed from
this action on June 9, 2016, following its settlement of all
claims with LifeWatch. See ECF Nos. 96, 98. LifeWatch has not
sued any other administrators in this case, but it notes that
"[u]nsued co-conspirators include other Blue Plans." TAC ¶ 18.

4

several times a year and considers votes by each Blue Plan "as to whether a particular service, procedure, or medical device should be covered." Id. ¶ 59. LifeWatch alleges that "all Blue Plans agree to adopt all or substantially all of the Association's coverage decisions, as expressed in the model 'medical policy,'" and that, "[t]o enforce the Uniformity Rule, the Association 'audits' each Blue Plan's medical policies." Id. ¶ 58. According to LifeWatch, "[i]f an audit finds substantial deviations from the model medical policy, the Blue Plan can be penalized and risks losing the right to use the Blue Cross name." Id.

Specifically with regard to MCOT devices, LifeWatch alleges that Defendants "have repeatedly voted on the model medical policy that requires blanket denial of telemetry coverage." Id. ¶ 60. LifeWatch argues that "this policy is inconsistent with the medical literature; the opinions of the independent experts who specifically rejected [Defendants'] position; and the conclusions of other commercial medical insurers, Medicare, and Medicaid." [2] Id. ¶ 61. In light of this

_____

[2]     LifeWatch cites numerous published studies supporting its claims that "there is reliable evidence that telemetry is superior to event monitoring technology and that telemetry provides more effective detection of infrequent cardiac arrhythmias than other monitoring devices." Id. ¶ 36 (internal quotation marks omitted); see also id. ¶¶ 35, 37-41, 45 (summarizing specific scientific reports on telemetry). LifeWatch also cites a 2010 American Heart Association

alleged inconsistency, LifeWatch believes that the Blue Plans have continuously denied coverage for MCOT devices "not because of an independent evaluation of the evidence, but pursuant to their horizontal agreement to make consistent coverage denials and refuse to deal in disfavored products, such as telemetry." Id.

LifeWatch claims that, as a direct result of Defendants' "concerted refusal to deal," LifeWatch "suffers reduced revenue and profits and sees its incentive to innovate diminished." Id. ¶ 63. LifeWatch alleges further that Defendant has "distorted the outpatient cardiac-monitoring device market and substantially reduced the demand for and output of telemetry." Id. ¶ 87. This distortion, LifeWatch argues, causes anticompetitive effects, including reduction in the quality of patients' cardiac monitoring; deprivation of the benefit to patients of quality competition; reduction of the output of MCOT services in the relevant markets; and inhibition of research and development, innovation, and future competition to improve the quality of MCOT services. See id. ¶¶ 75-80.

_____

literature review of available outpatient cardiac-monitoring devices, including a decision tree for physicians showing that "telemetry is the only choice for one palpitation situation and one syncope situation and is a preferred choice for two other situations." Id. ¶ 42; see also id. ¶ 43 (further explaining the recommendations in the 2010 American Heart Association literature review).

Based on the foregoing facts, LifeWatch brings a single count of conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Id. ¶ 95. LifeWatch seeks a permanent injunction prohibiting Defendants from "entering into, or honoring or enforcing, any agreements that cause them to act in concert in deciding whether to deny or restrict coverage for telemetry" along with treble damages, reasonable costs, and attorneys' fees. Id. ¶ 98.

## II. PROCEDURAL HISTORY

The motion presently before the Court arrived along a circuitous route. LifeWatch filed its initial complaint in this Court on September 10, 2012. ECF No. 1. It was not until August 6, 2015, that Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[3] ECF No. 48. After the parties

---

[3] In the interim period, the case was transferred into and then back out of a multidistrict litigation ("MDL"). On November 9, 2012, Defendant Blue Cross notified the Court that it had filed a Notice of Related Action tagging this action as related to certain cases pending transfer to create an MDL styled as In re Blue Cross & Blue Shield Antitrust Litig., MDL-2406. ECF No. 32. Subsequently, on December 13, 2012, the Judicial Panel on Multidistrict Litigation (the "Panel") issued a conditional order transferring this case to an MDL in the Northern District of Alabama. See ECF No. 34 at 2. As a result, on December 20, 2012, the Court approved a stipulation for temporary stay of proceedings in this case. Id. On February 13, 2013, the Court approved and signed a second stipulation by the parties to continue the temporary stay. ECF No. 43.

LifeWatch initially opposed transfer and moved to vacate the conditional transfer order, arguing that this action

stipulated to several extensions, LifeWatch filed its response to the motion to dismiss on September 24, 2015, ECF No. 61, and Defendants moved for leave to file a reply brief in further support of their motion to dismiss, ECF No. 64.

During late 2015 and early 2016, the Court entertained a series of motions regarding a request by Plaintiff's former counsel to withdraw from the case. See ECF Nos. 69-85. These proceedings, which included a hearing held on November 3, 2015, ECF No. 77, ultimately resulted in the substitution of new counsel for Plaintiff, who filed an unopposed motion for leave to file a third amended complaint on February 16, 2016, ECF No. 87. The Court granted LifeWatch leave to file a third amended complaint on February 17, 2016.[4] ECF No. 89.

LifeWatch filed its third amended complaint on February 25, 2016, ECF No. 90, and it is this complaint that

---

differs from the other centralized actions in that it focuses on an alleged conspiracy to deny insurance coverage for certain life-saving medical technologies, whereas the conspiracy alleged in the MDL proceedings dealt with the allegedly improper allocation of insurance markets. See ECF No. 46. The Panel was not persuaded by this argument and found instead that this case would benefit from the framework provided by the centralized proceedings for discovery and motion practice. See id. Accordingly, the Panel issued a transfer order on April 1, 2013. See id. ECF No. 46. On July 7, 2015, pursuant to the advisement of the transferee court, the Panel issued a conditional remand order, thereby sending the case back to this Court. ECF No. 47. The case was formally reopened that same day.

[4]     On February 17, 2016, the Court denied as moot both the motion to dismiss and motion for leave to file a reply brief. ECF No. 88.

Defendants now seek to dismiss.[5] The Court held a hearing on the motion on December 19, 2016, ECF No. 110, and grants that motion today.

### III. MOTION TO DISMISS

Defendants provide four independent reasons why the Court should dismiss LifeWatch's third amended complaint under Rule 12(b)(6): first, LifeWatch "lacks antitrust standing"; second, "there are no direct factual allegations of an agreement"; third, "LifeWatch has not alleged the anticompetitive effects in a relevant product and geographic market necessary to state a claim under the Sherman Act"; and, finally, "Blue [P]lans' telemetry monitor insurance coverage decisions are immune from antitrust challenge under the McCarran-Ferguson Act." Mot. Dismiss. at 2-3, ECF No. 95; see also Mot. Dismiss Mem. at 9, ECF No. 95-2.

    A.    Legal Standard

A party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering such a motion, the Court must "accept as true all allegations in the complaint and all reasonable

---

[5]     After being granted an extension, Defendants timely filed a motion to dismiss the third amended complaint on May 31, 2016. ECF No. 95. On June 30, 2016, LifeWatch filed a response in opposition to Defendants' motion to dismiss. ECF No. 100.

inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." DeBenedictis v. Merrill Lynch & Co., 492 F.3d 209, 215 (3d Cir. 2007) (quoting Rocks v. City of Phila., 868 F.2d 644, 645 (3d Cir. 1989)). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[6] Id.

To survive a motion to dismiss, the pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. See Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

---

[6]     Particularly within the antitrust context, the Third Circuit has interpreted Twombly as teaching that "allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 322-23 (3d Cir. 2010) (quoting Twombly, 550 U.S. at 567). Nevertheless, "it is inappropriate to apply Twombly's plausibility standard with extra bite in antitrust and other complex cases." West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010).

A plaintiff is entitled to all reasonable inferences from the facts alleged. Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval by Twombly, 550 U.S. at 555). Legal conclusions, however, are not entitled to deference, and a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. In deciding a Rule 12(b)(6) motion, a court limits its inquiry to the facts alleged in the complaint and its attachments, matters of public record, and undisputedly authentic documents, insofar as any claims are based upon these documents. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

B.    Discussion

Defendants argue in their motion to dismiss that "LifeWatch has not alleged injury of the type the antitrust laws were intended to prevent." Mot. Dismiss Mem. at 10. They contend that "[t]he gravamen of LifeWatch's complaint is that it suffered harm to its own business in the form of lost profits as a result of Blue [P]lan decisions not to cover telemetry monitors," but this "cannot constitute antitrust injury" because "harm to an individual is not harm to competition." Id. (citing TAC ¶¶ 6, 88, 96). "Moreover," Defendants argue, "any alleged reduction in output, quality, or choice has not resulted from

11

any alleged 'competition-<u>reducing</u>' conduct by Blue [P]lans, which treat all telemetry monitor providers equally." <u>Id.</u> at 11 (quoting <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 344 (1990)).

LifeWatch responds that Defendants "reduce competition by using their oligopsony power when they refuse to purchase telemetry products," Opp. at 13, ECF No. 101-1 (citing TAC ¶ 5), and further that "[a] concerted refusal to buy telemetry devices prevents sales of the main product LifeWatch produces," <u>id.</u> at 16. LifeWatch connects the alleged violation to the alleged injury by arguing that "denying sales to LifeWatch--its injury-- is the means by which Defendants seek to achieve their anticompetitive end: colluding to deny coverage to subscribers." <u>Id.</u> at 12-13.

Accepting the facts alleged in the complaint as true, and even assuming in favor of LifeWatch that the Uniformity Rule exists and constitutes a conspiracy amongst Blue Plans to deny coverage for telemetry devices, the Court finds that this alleged conspiracy does not violate antitrust law.[7]

---

[7]    This is not to be confused with a finding that LifeWatch has suffered no antitrust injury, which is "an issue that only comes into play as and when it appears that all the elements of liability have been adequately alleged":

   If a plaintiff tries to make an antitrust case by
   alleging that the defendant spat in the street, it
   would be ridiculous for the court to respond, "Now I

LifeWatch describes "the alleged violation" as "the Uniformity Rule's buyer-side reduction of competition for telemetry." Opp. at 16. It explains that, "[i]n the United States healthcare market, where insurers serve as the primary purchasers of healthcare and monitors have no alternative uses, disfavored suppliers are unable to replace sales lost due to the Uniformity Rule." Id. at 14. LifeWatch's argument, in essence, is that Defendants have behaved illegally by agreeing with one another, as potential buyers of telemetry devices, not to buy telemetry devices, regardless of vendor.

To evaluate whether this agreement is actually illegal, it is necessary to examine the purpose of the antitrust laws. The purpose of the Sherman Act is to "protect the public from the failure of the market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993); see also 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise,

_____

know that spitting in the street is not an antitrust violation. But suppose it were. What would be the anticompetitive effect of spitting in the street, and has this plaintiff demonstrated any such effect?" To try to answer a question in that form is to undertake a fool's errand.

Ronald W. Davis, Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury, 70 Antitrust L.J. 697, 732 (2003). The Court doubts that LifeWatch can establish antitrust standing. The Court need not fully flesh out this analysis or actually decide this question, however, because it finds that LifeWatch has failed to adequately plead an antitrust violation in the first place.

or conspiracy, <u>in restraint of trade or commerce</u> among the several States, or with foreign nations, is declared to be illegal." (emphasis added)). The Supreme Court has recognized that "[t]he history of the Sherman Act as contained in the legislative proceedings is emphatic in its support for the conclusion that 'business competition' was the problem considered and that the act was designed to prevent restraints of trade which had a significant effect on such competition." <u>Apex Hosiery Co. v. Leader</u>, 310 U.S. 469, 493 n.15 (1940); <u>see also</u> William H. Page, <u>The Scope of Liability for Antitrust Violations</u>, 37 Stan. L. Rev. 1445, 1451 (1985) ("[M]ost commentators now agree that the purpose of the substantive [antitrust] law is to maximize economic efficiency, or consumer welfare, by the preservation of competitive markets."). Accordingly, "[t]he law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." <u>Spectrum Sports, Inc.</u>, 506 U.S. at 458; <u>see also</u> <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488 (1977) (explaining that antitrust laws "were enacted for 'the protection of competition not competitors'" (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 320 (1962))).

LifeWatch relies primarily on two cases: <u>West Penn Allegheny Health Sys., Inc. v. UPMC</u>, 627 F.3d 85 (3d Cir. 2010),

14

and <u>Blue Shield of Virginia v. McCready</u>, 457 U.S. 465 (1982). In

<u>West Penn</u>, the second-largest hospital system in Pittsburgh

("West Penn") brought a lawsuit under the Sherman Act and

applicable state law against Pittsburgh's dominant hospital

system ("UPMC") and health insurer ("Highmark") for having

conspired to insulate one another from competition. <u>See</u> 627 F.3d

at 91-92. Specifically, West Penn alleged that UPMC and Highmark

had "form[ed] a conspiracy to protect one another from

competition," under which "the dominant hospital system used its

power in the provider market to insulate the health insurer from

competition, and in exchange the insurer used its power in the

insurance market to strengthen the hospital system and to weaken

the plaintiff." <u>Id.</u> at 91. In finding that the district court

had erred in dismissing the Sherman Act claims, the Third

Circuit emphasized West Penn's allegation that "Highmark paid

West Penn depressed reimbursement rates, not as a result of

independent decisionmaking, <u>but pursuant to a conspiracy with</u>

<u>UPMC, under which UPMC insulated Highmark from competition in</u>

<u>return for Highmark's taking steps to hobble West Penn</u>." <u>Id.</u> at

104 (emphasis added).

In <u>McCready</u>, the defendant insurer, Blue Shield ("Blue

Shield"), provided coverage for psychiatrists providing

psychotherapy but denied it for psychologists performing the

same services:

> McCready charges Blue Shield with a purposefully
> anticompetitive scheme. She seeks to recover as
> damages the sums lost to her as the consequence of
> Blue Shield's attempt to pursue that scheme. She
> alleges that Blue Shield sought to induce its
> subscribers into selecting psychiatrists over
> psychologists for the psychotherapeutic services they
> required, and that the heart of its scheme was the
> offer of a Hobson's choice to its subscribers. Those
> subscribers were compelled to choose between visiting
> a psychologist and forfeiting reimbursement, or
> receiving reimbursement by forgoing treatment by the
> practitioner of their choice.

Id. at 483 (footnotes omitted). The Supreme Court upheld the

antitrust standing of a plaintiff patient ("McCready") claiming

that certain Blue Shield plans had engaged in an unlawful

conspiracy with a group of psychiatrists "to exclude and boycott

clinical psychologists from receiving compensation under the

Blue Shield plans." 457 U.S. at 469 (internal quotation marks

omitted).

    Both West Penn and McCready are distinguishable from

the present case. The conspiracy in West Penn was, in fact, such

a clear antitrust violation that its conspirators acknowledged

"candidly" that it was "probably illegal." West Penn, 627 F.3d

at 94 (internal quotation marks omitted). Similarly, McCready

involved a "purposefully anticompetitive scheme" that forced a

"Hobson's choice" on its subscribers, including the plaintiff,

McCready. McCready, 457 U.S. at 483. Critical to the Court's

finding was the fact that "the damages [the plaintiff] claimed

were occasioned by the loss of consumer choice, a value

protected by the antitrust rule she invoked." Ronald W. Davis,

Standing on Shaky Ground: The Strangely Elusive Doctrine of

Antitrust Injury, 70 Antitrust L.J. 697, 711-12 (2003) (emphasis

added).

Here, although LifeWatch alleges that the Blue Plans

have a conspiracy in the form of the "Uniformity Rule,"

LifeWatch does not allege that this conspiracy was undertaken to

insulate any Blue Plan from competition in return for another

Blue Plan taking steps to "hobble" LifeWatch (or any other

telemetry provider, for that matter), nor to unfairly restrain

competition in any other manner. Whereas the conspiracy at issue

in West Penn was undertaken between two parties "to protect one

another from competition," id. at 91, no such similar allegation

has been made or could be made here.[8]

---

[8]      In their reply, Defendants distinguish both West Penn
and McCready on the basis that those cases involved alleged
conspiracies with the respective plaintiffs' competitors,
whereas here, "LifeWatch does not allege that Defendants
conspired with a LifeWatch competitor to reduce competition
among telemetry providers," and "Defendants did not conspire
with LifeWatch competitors to boycott LifeWatch." Reply Mem. at
6-7, ECF No. 102-1. The Court agrees with Defendants'
observation, but cautions that "[t]he availability of [an
antitrust] remedy to some person who claims its benefit is not a
question of the specific intent of the conspirators" and "cannot
reasonably be restricted to those competitors whom the
conspirators hoped to eliminate from the market." McCready, 457
U.S. at 479; see also Ronald W. Davis, Standing on Shaky Ground,
70 Antitrust L.J. at 761 (opining that the Third Circuit has
been "misled" by Supreme Court precedent into promoting "a flat
rule limiting antitrust injury only to customers or
competitors").

Here, subscribers face no similar "Hobson's choice" because the Blue Plans do not cover <u>any</u> telemetry device supplied by <u>any</u> provider.

Even assuming (without deciding) that LifeWatch has adequately pled that some Blue Plans have conspired to deny coverage for telemetry devices,[9] and even assuming (without deciding) that LifeWatch has adequately pled that it has suffered lost sales and thus lost profits as a result of this conspiracy, the Court finds that LifeWatch cannot show that the conspiracy was undertaken to cause any "restraints of trade which [have] a significant effect on [business] competition."[10]

_____

[9] LifeWatch does not allege that all Blue Plans have participated in the alleged conspiracy. <u>See</u> <u>infra</u> n.12.

[10] This is not exactly a failure to show antitrust injury or antitrust standing, but instead a failure to plead a necessary component of substantive liability under the Sherman Act:

> When a court concludes that no violation has occurred, it has no occasion to consider standing . . . . An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has

Apex Hosiery, 310 U.S. at 493 n.15. Instead, LifeWatch claims only that "[t]he Uniformity Rule reduces market competition . . . by reducing purchases of telemetry." Opp. at 15.

Furthermore, even assuming that the Uniformity Rule (insofar as it exists at all) causes anticompetitive effects, such effects do not necessarily indicate that antitrust law has been violated. LifeWatch claims that the Uniformity Rule reduces competition by reducing purchases of telemetry, and further that this rule causes "anticompetitive effects in the relevant markets by distorting the market for outpatient cardiac-monitoring devices and creating an insurance marketplace unresponsive to consumer demand." TAC ¶ 94; see also id. ¶¶ 75-80 (listing anticompetitive effects, including reduction in the quality of patients' cardiac monitoring; deprivation of the benefit to patients of quality competition; reduction of the output of MCOT services in the relevant markets; and inhibition of research and development, innovation and future competition to improve the quality of MCOT services). Anticompetitive

---

occurred and that even suit by the government--which enjoys automatic standing--must be dismissed.

Levine v. Cent. Florida Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996), cert. denied, 519 U.S. 820 (1996) (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 360f, at 202-03 (rev. ed. 1995)).

effects, however, do not result exclusively from unlawful
conduct. As Defendants correctly state in their reply, "listing
potential [market] inefficiencies cannot meet LifeWatch's burden
because <u>LifeWatch has not plausibly alleged that those</u>
<u>inefficiencies resulted from conduct that is competition-</u>
<u>reducing</u>." Reply Mem. at 4 (emphasis added).

Defendants' refusal to cover telemetry devices does
not constitute competition-reducing conduct. As Defendants point
out, "LifeWatch alleges that each Blue [P]lan treats all
telemetry providers <u>equally</u>." <u>Id.</u> (citing TAC ¶¶ 56-86, 91-97);
<u>see also</u> <u>id.</u> (explaining LifeWatch's allegation that "either the
Blue [Plan] covers no telemetry monitors or covers all telemetry
monitors"). Because LifeWatch alleges that Defendants treat all
telemetry providers equally, LifeWatch fails to show that this
treatment--concerted or not--violates antitrust laws, which
"were enacted for 'the protection of competition not
competitors.'"[11] <u>Brunswick</u>, 429 U.S. at 488 (quoting <u>Brown Shoe</u>
<u>Co.</u>, 370 U.S. at 320).

---

[11]      Though LifeWatch briefly mentions (for the first time
in its opposition to Defendants' motion to dismiss) that the
purported "anticompetitive end" of the Uniformity Rule is
"colluding to deny coverage to subscribers," Opp. at 12-13,
LifeWatch does not describe how this "collusion" constitutes
"conduct which unfairly tends to destroy competition itself,"
<u>Spectrum Sports</u>, 506 U.S. at 458. It is unclear what competition
the Blue Plans theoretically could seek to unfairly destroy via
the Uniformity Rule: Competition amongst telemetry providers to
sell devices to insurance plans? No, because LifeWatch does not

An alternative explanation for the conduct at issue is that the Blue Plans have simply decided--whether in a concerted fashion or not--that the benefits of telemetry devices do not (yet) outweigh their costs. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 322-23 (3d Cir. 2010) ("[A]llegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged." (quoting Twombly, 550 U.S. at 567)). LifeWatch readily acknowledges that telemetry devices are about "three times as costly" as other options for monitoring cardiac arrhythmia, TAC ¶ 7, and further, that "[t]he conspiracy's object is to lower the total price paid for outpatient cardiac monitoring," TAC ¶ 69. The Court agrees with Defendants that "[t]he fact that LifeWatch has been unable to persuade all insurance companies that telemetry is worth 'three times' the cost might reduce LifeWatch's sales, but it does not harm competition."[12] Mot. Dismiss Mem. at 23 (emphasis added).

---

allege that the Blue Plans treat various telemetry providers differently. Competition amongst insurance plans to purchase telemetry devices, or to enroll subscribers? No, because LifeWatch alleges that "the Blue Plans operate as if they were a single insurance company." Opp. at 3-4.

[12]    LifeWatch concedes that it continues to sell telemetry monitors to "Medicare, Medicaid, and other insurers," as well as several Blue Plans not named as defendants in this lawsuit. TAC ¶¶ 46, 82.

In light of the foregoing, the Court concludes that Defendants' refusal--whether concerted or not--to purchase any telemetry device--whether produced by LifeWatch or not--is not an antitrust violation, but rather a legal exercise of Defendants' monopsony power.[13] See West Penn, 627 F.3d at 103 ("A firm that has substantial power on the buy side of the market (i.e., monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services.").[14] The alleged fact that Defendants' decisions have caused LifeWatch's revenues to "drop[] dramatically," TAC ¶ 88, does not render Defendants' behavior illegal under the Sherman Act.

Because the Court concludes that LifeWatch has failed to allege an antitrust violation, the Court need not reach Defendants' arguments regarding antitrust standing, factual

---

[13]    "Monopsony power is market power on the buy side of the market." Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320 (2007) (citing Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991)).

[14]    It is not uncommon for anticompetitive effects to result from the exercise of monopsony or oligopsony power. See, e.g., Warren S. Grimes, The Sherman Act's Unintended Bias Against Lilliputians, 69 Antitrust L.J. 195, 210 (2001) ("The very nature of monopsony or oligopsony power is that it tends to suppress output and reduce quality or choice."); Maurice E. Stucke, Looking at the Monopsony in the Mirror, 62 Emory L.J. 1509, 1510 (2013) ("The monopsonist can also reduce the quality of products it purchases and the amount of innovation that an otherwise competitive market would foster.").

allegations of an agreement, anticompetitive effects in any relevant market, or immunity under the McCarran-Ferguson Act.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant the motion to dismiss with prejudice on the basis that LifeWatch has failed to allege an antitrust violation.[15] The Court declines to reach any other issues in this case.

An appropriate order follows.

---

[15] The Court declines to grant leave to amend on the basis that "amendment would be futile." Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000). Over the past five years, LifeWatch has amended its complaint three separate times--yet it still has not alleged any colorable antitrust violation and would not be able to do so even if the Court granted leave to amend yet again.