IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LIFEWATCH SERVICES, INC.,     :    CIVIL ACTION
                     :    NO. 12-5146
        Plaintiff,      :
                     :
    v.               :
                     :
HIGHMARK, INC., et al.,      :
                     :
        Defendants.     :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                December 28, 2020

## I.    INTRODUCTION

This is an antitrust action brought by LifeWatch Services, Inc. ("LifeWatch"), a seller of telemetry monitors, against the Blue Cross Blue Shield Association and five of its plan administrators[1] (collectively, "Blue Cross"). LifeWatch claims Blue Cross violated federal antitrust laws by conspiring to deny coverage of its telemetry monitors. LifeWatch seeks a permanent injunction and treble damages, inter alia. Blue Cross moves to dismiss the Third Amended Complaint, claiming immunity from antitrust liability under the McCarran-Ferguson Act.

---

[1] The Defendant plan administrators named in the Third Amended Complaint ("TAC") are: Wellpoint, Inc.; Horizon Blue Cross Blue Shield of New Jersey; BlueCross BlueShield of South Carolina; Blue Cross and Blue Shield of Minnesota; BlueCross BlueShield of South Carolina; and Highmark, Inc. LifeWatch subsequently settled its case against Highmark. TAC ¶¶ 13-17, ECF No. 90.

After almost eight years of litigation, including a stop at
the multidistrict litigation panel, litigation before this
Court, a substitution of counsel, a visit to the Third Circuit,
and a further hearing before this Court on remand, the case
comes down to one issue: Does the McCarran-Ferguson Act immunize
Blue Cross from antitrust liability under the circumstances of
this case? For the reasons set forth below, the Court concludes
that it does.[2]

---

[2]     In the instant case, the issue of McCarran-Ferguson immunity presents a
strict legal question. Resolution of the issue at the motion to dismiss stage
is therefore appropriate.
        Resolution at this stage is also consistent with the Third Circuit's
directive that a defendant "bears the burden of establishing its immunity
from antitrust liability" under the Act. Lifewatch Servs. Inc. v. Highmark
Inc., 902 F.3d 323, 343 (3d Cir. 2018). This is true even though the parties
have pointed to state statutes and regulations not contained in the
pleadings.
        Federal Rule of Civil Procedure 12(d) provides that if, on a 12(b)(6)
motion, "matters outside the pleadings are presented to and not excluded by
the court, the motion must be treated as one for summary judgment under Rule
56." For the purposes of conversion, "[m]emoranda of points of law and
authorities" and "matters of which the district court can take judicial
notice" are "not considered matters outside the pleadings." 5C Charles Alan
Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed.
2020); see also Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425
(2d Cir. 2008) (explaining that dismissal under 12(b)(6) "is appropriate when
a defendant raises . . . [a statutory bar] as an affirmative defense and it
is clear from the face of the complaint, and matters of which the court may
take judicial notice, that the plaintiff's claims are barred as a matter of
law." (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000))).
        In the instant matter, the Court can take judicial notice of the state
statutes and regulations the parties bring to its attention. See O'Neill v.
United States, 411 F.2d 139, 144 (3d Cir. 1969) ("Federal courts ordinarily
will take judicial notice of State statutes."). Therefore, the statutes and
regulations to which the parties point do not constitute "matters outside the
pleadings" for the purposes of Rule 12(d).
        The Third Circuit and other district courts in this circuit have
analyzed the issue of McCarran-Ferguson immunity at the motion to dismiss
stage. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 351 (3d Cir.
2010); McCray v. Fidelity Nat'l Title Ins. Co., No. 08-775, 2010 WL 3023164,
at *5 (D. Del. July 29, 2010), aff'd on other grounds, 682 F.3d 229 (3d Cir.
2012); In re New Jersey Title Ins. Litig., No. 08-1425, 2010 WL 2710570, at
*11 (D.N.J. July 6, 2010), aff'd on other grounds, 683 F.3d 451 (3d Cir.
2012).

## II.   BACKGROUND[3]

The parties, facts, and procedural history are set forth fully in prior opinions of the Court and the Third Circuit. See LifeWatch Servs. Inc. v. Highmark Inc., 248 F. Supp. 3d 641, 650 (E.D. Pa. 2017), rev'd and remanded, 902 F.3d 323 (3d Cir. 2018). The Court assumes familiarity with the history of this action and sets forth only those facts relevant to the instant Motion to Dismiss.

Plaintiff LifeWatch is a large seller of telemetry monitors, one of several types of outpatient cardiac monitors that detect changes in the heart's normal rate or rhythm. Defendant Blue Cross Blue Shield Association owns the rights to Blue Cross/Blue Shield trade names and trademarks. The Association licenses those trade names and trademarks to approximately thirty-six insurance plans and maintains a model medical policy recommending which medical devices to cover, inter alia.

_____

The parties to the instant matter agree that it is appropriate for this Court to do so. See Pl.'s Suppl. Mem. Opp'n Defs.' Mot. Dismiss 1, ECF No. 140 ("LifeWatch is content to allow resolution of this question on the pleadings."); Defs.' Suppl. Mem. Supp. Mot. Dismiss 1, ECF No. 139 ("[T]he parties agree that the McCarran argument before the Court is a legal question that can be decided now.").

Accordingly, the Court will proceed to address the issue at this stage and finds no reason to convert the motion to dismiss to a motion for summary judgment.

[3]   As required at the motion to dismiss stage, the Court accepts all well-pled factual allegations as true. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The model policy recommends against covering prescriptions for telemetry monitors. For more than ten years, at least thirty Blue Cross/Blue Shield licensed insurance plans have adopted a policy denying telemetry coverage. The insurers reached this decision despite multiple medical studies concluding that telemetry monitors are effective and, in some cases, superior to other cardiac monitoring devices. Medicare, Medicaid, and other private insurers cover telemetry monitor prescriptions.

In the instant action, LifeWatch alleges that the Blue Cross Blue Shield Association and five of its plan administrators violated the Sherman Act, 15 U.S.C. § 1, by conspiring to deny coverage of telemetry monitors. LifeWatch refers to this allegedly collusive agreement as the "Uniformity Rule." TAC ¶ 56, ECF No. 90.

In May of 2016, Blue Cross moved to dismiss the Third Amended Complaint for failure to state a claim. See Fed. R. Civ. P. 12(b)(6). Blue Cross argued: (1) the Complaint failed to allege either an agreement or anticompetitive effects; (2) LifeWatch lacked antitrust standing; and (3) Blue Cross is immune from antitrust liability under the McCarran-Ferguson Act. Defs.' Mot. Dismiss, ECF No. 95.

The Court granted the Motion to Dismiss for failure to allege anticompetitive effects and did not reach the antitrust standing or immunity arguments. LifeWatch, 248 F. Supp. 3d at

4

650. The Third Circuit reversed, holding that LifeWatch stated a claim and had antitrust standing. LifeWatch, 902 F.3d at 343. The Third Circuit remanded the issue presently before the Court: whether Blue Cross is immune from antitrust liability under the McCarran-Ferguson Act.

### III. LEGAL STANDARD

A party may move to dismiss a complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). When reviewing such a motion, the Court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from [the allegations] after construing them in the light most favorable to the non-movant." Conard v. Pa. State Police, 902 F.3d 178, 182 (3d Cir. 2018) (quoting Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss for failure to state a claim, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

5

## IV.  DISCUSSION

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. After the Supreme Court found the Sherman Act applicable to the insurance industry, Congress passed the McCarran-Ferguson Act to clarify that regulation of "the business of insurance" should be preserved for the states. See SEC v. Nat'l Sec., Inc., 393 U.S. 453, 458 (1969). Congress' primary concern with respect to the antitrust exemption was that "cooperative ratemaking efforts be exempt from the antitrust laws" because of "the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation." Grp. Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 221 (1979).

Accordingly, McCarran-Ferguson exempts from the Sherman Act conduct that: (1) "constitutes the business of insurance," (2) is "regulated by state law," and (3) does not "amount to a boycott, coercion, or intimidation." Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 124 (1982); see also 15 U.S.C. §§ 1012(b), 1013. "It is well settled that exemptions from the antitrust laws are to be narrowly construed." Royal Drug, 440 U.S. at 231. A defendant "bears the burden of establishing its

6

immunity from antitrust liability" under McCarran-Ferguson.
Lifewatch Servs. Inc. v. Highmark Inc., 902 F.3d 323, 343 (3d
Cir. 2018).

The parties concede that Blue Cross' alleged conduct does
not amount to a boycott, coercion, or intimidation but disagree
about whether the conduct constitutes the business of insurance
and whether it is regulated by state law.

### A.    **The Business of Insurance**

Two Supreme Court opinions inform this Court's analysis of
whether the challenged conduct constitutes the "business of
insurance" under the McCarran-Ferguson Act.

In Group Life & Health Insurance Co. v. Royal Drug Co., 440
U.S. 205 (1979), independent pharmacies alleged that Blue Shield
of Texas and several pharmacies violated the Sherman Act by
agreeing to fix the retail prices of drugs and pharmaceuticals.
If a policyholder chose to fill a prescription at a pharmacy
with which Blue Shield had such an agreement, she paid only $2
for every prescription drug, and Blue Shield paid the remaining
cost directly to the pharmacy. Id. at 209. But if she selected a
pharmacy that had not entered into such an agreement, she paid
the full price charged by the pharmacy and could subsequently
obtain reimbursement from Blue Shield for part of the difference
between that price and $2. Id.

The Court concluded that the challenged pharmacy agreements did not constitute the "business of insurance" within the meaning of the McCarran-Ferguson Act because they did not underwrite or spread risk. Id. at 214. "The fallacy of the [defendants'] position," the Court noted, "is that they confuse the obligations of Blue Shield under its insurance policies, which insure against the risk that policyholders will be unable to pay for prescription drugs during the period of coverage," with the pharmacy agreements, "which serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations." Id. at 213. Such cost-savings arrangements, the Court concluded, were not the "business of insurance." Id. at 214.

In reaching this conclusion, the Court underscored that, in enacting the McCarran-Ferguson Act, Congress was concerned with "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'" Id. at 215-16 (quoting SEC v. Nat'l Sec., Inc., 393 U.S. 453, 460 (1969)). Congress' clear focus "was on the relationship between the insurance company and the policyholder." Id. at 216 (quoting Nat'l Sec., Inc., 393 U.S. at 460). In contrast, the pharmacy agreements at issue in Royal Drug were not "between insurer and insured," but were "separate

8

contractual agreements between Blue Shield and pharmacies engaged in the sale and distribution of goods and services other than insurance." Id. Accordingly, the challenged conduct was not exempt from antitrust laws.

A few years later, in Union Labor Life Insurance Co. v. Pireno, 458 U.S. 119 (1982), the Court considered a chiropractor's challenge to an insurance company's use of a "peer review committee" of chiropractors to review policyholders' claims. The policy limited coverage of chiropractic treatments to "reasonable" charges for "necessary" medical care and services. Id. at 122. After receiving chiropractic treatments, a policyholder submitted a claim for reimbursement, and committee members evaluated whether the treatments were necessary and whether the fees were reasonable. Id. at 123. The plaintiff alleged that the insurance company and members of the peer review committee conspired to eliminate price competition among chiropractors in violation of section 1 of the Sherman Act. Id. at 124. The defendants claimed immunity under the McCarran-Ferguson Act, arguing their alleged behavior constituted the "business of insurance." Id. at 131.

The Supreme Court disagreed, determining that the insurance company's use of a peer review committee "play[ed] no part in the 'spreading and underwriting of a policyholder's risk.'" Id. at 130 (quoting Royal Drug, 440 U.S. at 211). The Court noted

9

that the arrangement between the insurer and the review committee was "logically and temporally unconnected to the transfer of risk accomplished by [the insurer's] policies" because "[t]he transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered." Id.

In distilling the Court's analyses, Pireno identified three criteria relevant to determining whether a particular practice constitutes the business of insurance for the purposes of McCarran-Ferguson immunity: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." Id. at 129. The Court will discuss these criteria seriatim.

### 1. Transferring or spreading risk

LifeWatch points to Royal Drug and Pireno to advance its argument that Blue Cross' decision to deny coverage for telemetry monitors does not transfer or spread policyholders' risk.

In both Royal Drug and Pireno, the challenged conduct involved post hoc administration of the benefits provided under

10

the contract between the insurer and the insured (coverage for prescription drugs and chiropractic treatment, respectively) and not the transfer or spread of risk, which had already occurred via the contract. See Royal Drug, 440 U.S. at 213 (noting that unlike "obligations of Blue Shield under its insurance policies," agreements between Blue Shield and third-party pharmacies "serve[d] only to minimize the costs Blue Shield incur[red] in fulfilling its underwriting obligations" and therefore did not "involve any underwriting or spreading of risk"); Pireno, 458 U.S. at 130 ("The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered.").

In the instant action, the Third Amended Complaint makes this distinction clear. LifeWatch's allegations demonstrate that this case challenges the allocation of risk (no telemetry coverage for the insured) between the insurer and the insured via the insurance contract:

> 7.    Blue Cross purports to reconsider its stance on telemetry several times a year. Yet the Blue Plans have adhered in lockstep to blanket denials of coverage for telemetry despite plain and mounting evidence of efficacy and superiority. Because telemetry devices are about three times as costly as the substituted devices, Blue Cross's concerted refusal to deal with respect to telemetry devices puts millions of dollars of additional money into the hands of the Blue Plans.

11

8.  But for their agreement, the Blue Plans would not have
    monolithically maintained that telemetry is <u>never</u>
    "medically necessary," or that it is "experimental" or
    "investigational," which are the positions offered by
    the Blue Plans to justify their concerted refusal to
    deal. . . .

56. There is a reason why, for more than a decade, almost
    all Blue Plans have uniformly held, year after year,
    that for <u>all</u> patients and <u>all</u> conditions, telemetry is
    <u>never</u> "medically necessary," despite contrary (a)
    scientific evidence, summarized above; (b) decisions
    of independent arbiters, just quoted; and (c) practice
    of Medicare, Medicaid, and other insurers. The reason
    is a horizontal anticompetitive agreement, the Blue
    Cross "Uniformity Rule," as explained in this section.

60. The Defendant Plans have repeatedly voted on the model
    medical policy that requires blanket denial of
    telemetry coverage. . . .

61. As noted, this policy is inconsistent with the medical
    literature; the opinions of the independent experts
    who specifically rejected the above-quoted position;
    and the conclusions of other commercial insurers,
    Medicare, and Medicaid. The position was adopted, year
    after year for a decade, by 30-plus Blue Plans, not
    because of an independent evaluation of the evidence,
    but pursuant to their horizontal agreement to make
    consistent coverage denials and refuse to deal in
    disfavored products, such as telemetry. . . .

62. . . . (a) WellPoint denies coverage by claiming that
    "this service is considered to be not medically
    necessary." (b) Horizon denies coverage for telemetry
    by claiming that the "charges are not covered.
    Treatment, services or supplies that do not meet our
    guidelines are not covered under the member's plan."
    (c) Blue Minnesota denies coverage for telemetry by
    claiming that "[p]rocedures determined to be
    investigational are not covered under the patient's
    coverage."

68. The Uniformity Rule restrains trade in at least two
    markets. In the market for the purchase of health-
    insurance plans (i.e., where the Blue Plans are
    <u>sellers</u>), the Uniformity Rule constitutes a horizontal

> agreement not to compete based on the package of
> services offered. The Uniformity Rule guarantees that
> all Blue Plans will offer substantially equivalent
> interpretations of substantially equivalent policies
> so that, if one does not provide certain coverage,
> none do.

TAC ¶¶ 7–8, 56, 60–62, 68, ECF No. 90.

According to these allegations, the challenged refusal to cover telemetry monitors occurs "year after year" and "for all patients and all conditions," id. ¶ 56, even before the insured and the insurer enter into a contract. Rather than engaging in a case-by-case, post-issuance review process about whether a specific policyholder's claim involved necessary treatment, as the board in Pireno did, the Defendants in the instant action allegedly formed "a horizontal agreement not to compete based on the package of services offered" in their contracts with insureds. Id. ¶ 68; cf. Pireno, 458 U.S. at 123.

The contract between insurer and insured allocates risk between the parties. See Royal Drug, 440 U.S. at 213; Pireno, 458 U.S. at 130; Owens v. Aetna Life & Cas. Co., 654 F.2d 218, 225 (3d Cir. 1981) (recognizing that activities pertaining to "the contract between the insurer and the insured" constitute "the business of insurance"); cf. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 357 (3d Cir. 2010) (finding that the defendants' alleged agreement did not transfer or spread risk

13

because it did not involve "who could receive insurance coverage, or the type of coverage they could obtain").[4]

In this case, the insurance contract between Blue Cross and its subscribers, by excluding from coverage all telemetry treatment under all circumstances, allocates the risk between the parties.[5] Accordingly, Blue Cross satisfies the first prong of the business of insurance test.

## 2. Integral part of the policy relationship

LifeWatch relies on Pireno to argue that the challenged conduct is not an integral part of the relationship between the insurer and the insured. The Pireno Court determined that the insurers' use of the peer review committee was not an integral part of the policy relationship because "the challenged arrangement between [the insurer] and [the peer review

---

[4]     The Third Circuit also applied the teachings of Royal Drug and Pireno in Ticor Title Ins. Co. v. FTC, 998 F.2d 1129 (3d Cir. 1993). In Ticor, the court determined that title insurance companies' collective establishment of title search and examination rates did not satisfy the "business of insurance" prong of McCarran-Ferguson. The court reasoned that, like the processes in Pireno and Royal Drug, "title search and examination has nothing to do with the actual performance of the title insurance contract. Instead, the title search and examination is 'a matter of indifference to the policyholder, whose only concern is whether his claim is paid, not why it is paid.'" Ticor, 998 F.2d at 1136 (quoting Pireno, 458 U.S. at 132). Accordingly, the court determined that the challenged rate setting activities did not constitute the business of insurance.
        The instant case, unlike Royal Drug, Pireno, and Ticor, involves the allocation of risk (denial of coverage of telemetry services) between the insured and the insurer via the contract for coverage. See Royal Drug, 440 U.S. at 213; Pireno, 458 U.S. at 130; Ticor, 998 F.2d at 1136.
[5]     To the extent that LifeWatch quarrels with the medical wisdom of Blue Cross excluding telemetry monitors from the basket of services it offers its subscribers, redress for this alleged wrong lies, if at all, not in the federal antitrust laws but with the insurance authorities in the respective states where LifeWatch may find relief. See infra Section IV.B.

committee] is obviously distinct from [the insurer]'s contracts with its policyholders." Pireno, 458 U.S. at 131. This "separate arrangement between the insurer and third parties not engaged in the business of insurance" rendered the challenged conduct not integral to the policy relationship. Id. at 132.

In contrast, the challenged conduct in the instant matter involves the package of services offered in Blue Cross' contracts with its subscribers. In fact, that conduct is integral to the policy relationship. See Ins. Brokerage, 618 F.3d at 357 (recognizing "a strong argument that [an alleged agreement between insurance brokers and insurers] would be 'an integral part of the policy relationship between the insurer and the insured' . . . insofar as it would affect the insurers from which a prospective purchaser could obtain coverage" (quoting Pireno, 458 U.S. at 129)). Blue Cross satisfies the second prong of the business of insurance test.

### 3. Limited to entities within the insurance industry

Finally, LifeWatch likens the Blue Cross Blue Shield Association to the Pireno peer review committee to argue that the challenged conduct is not confined to the insurance industry. But the two organizations have critical differences. Although the Association is not itself an insurer, it owns the rights to Blue Cross and Blue Shield trademark names and

licenses those trade names and trademarks to insurance plans.
Further, the Association maintains a model medical policy making
coverage recommendations to member plans.

These activities render the Association an entity within
the insurance industry for the purposes of McCarran-Ferguson.
Cf. Pireno, 458 U.S. at 132 ("[Defendant insurance company's]
use of [the] Peer Review Committee inevitably involves third
parties wholly outside the insurance industry——namely,
practicing chiropractors."). The parties do not dispute that the
Defendant plan administrators whose conduct is at issue are
entities within the insurance industry. Therefore, the
challenged conduct is limited to entities within the insurance
industry. Blue Cross satisfies the third prong of the business
of insurance test.

For the foregoing reasons, the challenged conduct
constitutes the "business of insurance" within the meaning of
the McCarran-Ferguson Act. See 15 U.S.C. § 1012(b).

### B.   Regulated by State Law

Under the second prong of the McCarran-Ferguson analysis,
challenged conduct is exempt from federal antitrust scrutiny
only if it is "regulated by state law." 15 U.S.C. § 1012(b).
As an initial matter, the parties disagree about which clauses
of the McCarran-Ferguson Act govern the Court's analysis of this
prong. The Court turns first to that issue.

1. <u>Applicable standard</u>

The applicable provision states:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That . . . the [antitrust laws] . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.

<u>Id.</u>

LifeWatch argues the Supreme Court's decision in <u>Humana Inc. v. Forsyth</u>, 525 U.S. 299 (1999), requires the Court to consider whether the challenged conduct "conflict[s] with or frustrate[s] any state's regulations or the policies they serve." Pl.'s Suppl. Mem. Opp'n Defs.' Mot. Dismiss 7, ECF No. 140. In <u>Humana</u>, the Supreme Court considered whether a state statute prohibiting unfair trade practices preempted the federal Racketeer Influenced and Corrupt Organizations Act (RICO) under McCarran-Ferguson. 525 U.S. at 302. The Court applied the first clause of section 1012(b) and considered whether RICO's application would "invalidate, impair, or supersede" the state law. <u>Id.</u> at 307. It determined that because RICO could be applied "in harmony with the State's regulation," McCarran-Ferguson did not preclude the RICO action. <u>Id.</u> at 304.

As <u>Humana</u> reflects, courts applying the first clause of section 1012(b) consider whether an actual conflict exists

17

between the federal action and the state regulatory scheme. See id. LifeWatch argues the Court should employ that analysis here. However, LifeWatch points to no case in which a court has expanded Humana to reach the second clause of section 1012(b). To the contrary, the argument has been rejected by at least two courts of appeals, as well as by the leading treatise on antitrust law. See Arroyo-Melecio v. Puerto Rican Am. Ins. Co., 398 F.3d 56, 66 n.7 (1st Cir. 2005) ("[I]f the state's insurance industry is 'regulated by state law,' then the antitrust laws simply do not apply, notwithstanding that the application of antitrust law in the particular case in no way 'invalidate[s], impair[s], or supersede[s]' state law and may even be consistent with it." (quoting I Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 219c, at 339 (2d ed. 2000))); Sanger Ins. Agency v. HUB Int'l, Ltd., 802 F.3d 732, 745 (5th Cir. 2015) (same); see also In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 351 (3d Cir. 2010) ("The second, proviso clause of Section 2(b) . . . is the clause relevant to this appeal.").[6]

---

[6]      In In re Ins. Brokerage, 618 F.3d at 351, the Third Circuit recognized that a court "cannot reflexively transplant" a holding addressing the first clause of section 2(b) to the second clause:

> Defendants overlook, however, an important distinction between Sabo and this case. Because Sabo involved a RICO rather than an antitrust claim, it was governed by the first clause of § 2(b) of the McCarran-Ferguson Act. That clause provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. §

As these cases indicate, courts have consistently treated antitrust actions as governed only by the second clause of section 1012(b). See Areeda & Hovenkamp, supra, ¶ 219c. That clause does not direct courts to consider whether antitrust laws conflict with state regulations. See 15 U.S.C. § 1012(b).

Accordingly, in the instant action, the Court need only consider whether the respective states regulate the challenged conduct, and not whether federal antitrust laws invalidate,

---

1012(b). This "first clause . . . impos[es] what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." U.S. Dep't of Treasury v. Fabe, 508 U.S. 491 (1993). Both clauses incorporate the phrase "business of insurance," but as the Supreme Court has emphasized, the respective protections afforded to state law under the two clauses are of different scopes. "The first clause commits laws 'enacted . . . for the purpose of regulating the business of insurance' to the States, while the second clause exempts only 'the business of insurance' itself from the antitrust laws." Id. at 504. Because "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' . . . necessarily encompasses more than just the business of insurance," id. at 505, judicial determinations made when applying one clause may not be dispositive when applying the other. As Sabo itself explained, "Fabe makes clear [that] the Royal Drug test is only a starting point in the analysis for non-antitrust cases." 137 F.3d at 191 n.3; see also Jonathan R. Macey & Geoffrey P. Miller, The McCarran-Ferguson Act of 1945: Reconceiving the Federal Role in Insurance Regulation, 68 N.Y.U. L. Rev. 13, 22 (1993) ("[I]t appears that the meaning of [the 'business of insurance'] varies depending upon whether the case involves antitrust [i.e., clause two] or other regulatory [i.e., clause one] matters."). Accordingly, we cannot reflexively transplant Sabo's holding into our analysis under the second clause of § 2(b).

Id. at 360 (alterations in original) (citations omitted).

impair, or supersede those state laws. The Court turns next to
that issue.

### 2. Applicable state regulation

In FTC v. National Casualty Co., 357 U.S. 560 (1958), the
Supreme Court considered a Federal Trade Commission (FTC) order
prohibiting the respondent insurance companies from engaging in
certain advertising practices. The order sought "to proscribe
activities within the boundaries of States that have their own
statutes prohibiting unfair and deceptive insurance practices as
well as within States that do not." Id. at 562. The Fifth and
Sixth Circuit Courts of Appeals set aside the order, holding
that the McCarran-Ferguson Act prohibited the FTC from
regulating the challenged conduct in the states that regulated
the practices under their own laws. Id.

The FTC appealed, arguing that the regulations at issue
constituted "general prohibition[s] designed to guarantee
certain standards of conduct" and were "too 'inchoate' to be
'regulation'" within the meaning of the McCarran-Ferguson Act.
Id. at 564. The Supreme Court disagreed and affirmed the lower
courts, explaining that the "regulated by state law" prong is
satisfied where "[e]ach State in question has enacted
prohibitory legislation which proscribes unfair insurance
advertising and authorizes enforcement through a scheme of
administrative supervision." Id.

Demonstrating that a state law regulates challenged conduct is "not a high bar for antitrust defendants to clear." Sanger Ins. Agency v. HUB Int'l, Ltd., 802 F.3d 732, 745 (5th Cir. 2015). "Courts have recognized that the state regulation requirement of § 1012(b) is satisfied when 'a state has generally authorized or permitted certain standards of conduct' for insurance companies." In re New Jersey Title Ins. Litig., No. 08-1425, 2010 WL 2710570, at *10 (D.N.J. July 6, 2010) (quoting Ohio AFL–CIO v. Ins. Rating Bd., 451 F.2d 1178, 1181 (6th Cir. 1971)), aff'd on other grounds, 683 F.3d 451 (3d Cir. 2012).

According to the Third Amended Complaint, the challenged conduct in the instant case occurred in the following states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New York, Ohio, South Carolina, Virginia, and Wisconsin. TAC ¶¶ 13-16, ECF No. 90. Blue Cross bears the burden of demonstrating that state law regulates the challenged conduct in each of these states. See Nat'l Cas. Co., 357 U.S. at 564.

For each of the seventeen states at issue, Blue Cross points to multiple state statutes and/or regulations governing health insurance and unfair trade practices in the insurance

industry. See Suppl. Filing Supp. Defs.' Mot. Dismiss, App. A,

ECF No. 147-1.[7]

---

[7]     Blue Cross points to the following statutes and regulations, inter alia:

California: Cal. Ins. Code § 10403 ("General Regulation of Health Insurers"); id. §§ 790-790.15 ("Unfair Practices")

Colorado: Colo. Rev. Stat. §§ 10-16-101 to -1208 ("Health Care Coverage"); id. §§ 10-3-1103 to -1104 ("Unfair methods of competition")

Connecticut: Conn. Gen. Stat. §§ 38a-469 to -594 (regulating "Health Insurance"); id. §§ 38a-815 to -816 (regulating "Unfair practices")

Georgia: Ga. Code Ann. §§ 33-20-1 to -34 ("Health Care Plan Act"); id. §§ 33-6-1 to -37 ("Unfair Trade Practices")

Indiana: Ind. Code §§ 27-8-1-1 to -37-3 ("Life, Accident, and Health"); id. §§ 27-4-1-1 to -19 ("Unfair Competition" and "Unfair or Deceptive Acts and Practices")

Kentucky: Ky. Rev. Stat. Ann. §§ 304.17a-005 to -350 ("Health Benefit Plans"); id. §§ 304.12-010 to -275 ("Unfair Competition" and "Unfair, Deceptive Practices")

Maine: Me. Rev. Stat. Ann. tit. 24-a, §§ 2401-2453 ("The Insurance Contract"); id. §§ 2151-2189 ("Trade Practices and Frauds")

Minnesota: Minn. Stat. §§ 62a.01 to .672 ("Accident and Health Insurance"); id. §§ 72a.01 to .52 ("Insurance Industry Trade Practices")

Missouri: Mo. Rev. Stat. §§ 354.10 to .725 ("Health Services Corporations-Health Maintenance Organizations-Prepaid Dental Plans"); Mo. Code Regs. Ann. tit. 20, §§ 100-1.010 to -9.100 ("Insurer Conduct")

Nevada: Nev. Rev. Stat. §§ 689a.010 to .755 ("Individual Health Insurance"); id. §§ 686a.100, .110, .120 ("Trade Practices and Frauds")

New Hampshire: N.H. Rev. Stat. Ann. §§ 420-A to -P ("Health Service Corporations"); id. § 417 ("Unfair Insurance Trade Practices")

New Jersey: N.J. Stat. Ann. §§ 17b:27-26 to -51.14 ("Group Health and Blanket Insurance"); id. § 17b:30-13.1 ("Unfair Claim Settlement Practices")

New York: N.Y. Ins. Law §§ 3201-3243 ("Insurance Contracts-Life, Accident and Health, Annuities"); id. § 2403 ("Unfair Methods of Competition or Unfair and Deceptive Acts or Practices Prohibited")

Ohio: Ohio Rev. Code Ann. § 3902 ("Insurance Policies and Contracts"); id. §§ 3901.19 to .21 ("Unfair and Deceptive Acts")

South Carolina: S.C. Code Ann. § 38 ("Insurance"); id. § 38-57-30 ("Unfair Methods and Deceptive Acts")

LifeWatch protests that these statutes and regulations are insufficient to satisfy the "regulated by state law" prong of McCarran-Ferguson. It argues Blue Cross cannot satisfy the prong because Blue Cross "fail[s] to identify a single state statute that deals even generally with collusive agreements to deny coverage for telemetry." Pl.'s Suppl. Mem. Opp'n Defs.' Mot. Dismiss 7, ECF No. 140. But McCarran-Ferguson does not require state laws to contain the level of specificity for which LifeWatch advocates. Instead, "the presence of even minimal state regulation, even on an issue unrelated to the antitrust suit, is generally sufficient to preserve the immunity," and most courts are "satisfied with the existence of a state regulatory scheme and rather superficial indicators of supervision, without much regard for the actual intensity of state regulation." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 219 (4th ed. 2020).

The statutes and regulations to which Blue Cross points "generally authorize[] or permit[] certain standards of conduct" in the health insurance industry and are therefore sufficient to

---

Virginia: Va. Code Ann. §§ 38.2-4200 to -4235 ("Health Services Plans"); id. §§ 38.2-700 to -705 ("Antitrust Provisions")

Wisconsin: Wis. Stat. § 609 ("Defined Network Plans"); id. § 628.34 ("Unfair Marketing Practices")

satisfy the "regulated by state law" prong of the McCarran-Ferguson analysis. See New Jersey Title Ins. Litig., 2010 WL 2710570, at *10 (quoting Ohio AFL–CIO, 451 F.2d at 1181).

For the foregoing reasons, the challenged conduct is regulated by state law.

## V.   CONCLUSION

Blue Cross has satisfied the three prongs of the McCarran-Ferguson analysis and is therefore entitled to antitrust immunity under the Act. Accordingly, the Motion to Dismiss will be granted. An order consistent with this memorandum will issue.